UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

|  |  |  |
|---|---|---|
| IN RE PETITION OF | ) ) ) | |
| **GEOFF SHEPARD** | ) | **Misc. Action No.** 11-44 (RcL) |
| 2 Old Mill Lane | ) | |
| Media, PA 19063 | ) ) | |
| _____ | ) | |

## DECLARATION OF GEOFF SHEPARD

I, Geoff Shepard, hereby declare as follows:

1.  I am an attorney with a particular interest in the Nixon/Ford administrations, in which I served from August, 1969, through March, 1975; first as a White House Fellow and then as a member of the White House Domestic Council staff. My fellowship year was spent at the Treasury Department, where I first came to know Gordon Liddy. I was hired onto the Domestic Council staff by John Ehrlichman, its Executive Director, and my immediate superior was Egil "Bud" Krogh, then associate director for general government. My principal focus was on policy issues involving the Department of Justice and law enforcement responsibilities of the Treasury Department. I succeeded Krogh as associate director in November, 1972 and remained in that position, including under President Ford, through March, 1975. In the course of my government employment, I knew and worked with virtually all the principle figures in the Watergate scandal.

2.  From October, 1973 to August, 1974, I also acted as principal deputy to J. Fred Buzhardt, who was special counsel to President Nixon during the Watergate defense efforts. In that capacity, I prepared the final drafts of transcripts of White House tapes that were

published on April 30, 1974; helped recruit the legal staff that supported the work of James St. Clair; and was responsible for the Document Rooms holding the files of John Dean, John Ehrlichman, and H.R. "Bob" Haldeman.

3.  In the latter capacity, I identified and removed several documents which were used by the Watergate Special Prosecution Force (WSPF) in the Plumbers and cover-up trials. As a consequence, I appeared as a "chain of custody" witness for the Government in the Plumbers trial and was subpoenaed to appear for the same purpose in the cover-up trial.

4.  While I knew and had worked with virtually every major figure in the Watergate scandal and participated in the President's defense, I was never implicated in the scandal itself. I possess a letter from the Special Prosecutor dated August 28, 1975, which states in pertinent part:

> After checking with our various task forces, I can confirm that you are not, and have not been, the subject of any investigation of this Office.

5.  I have been troubled for the past thirty-five years over how a president who had been re-elected by 61% of the voters in November, 1972 could have been forced to resign in disgrace only eighteen months later. My views of how this was accomplished are in substantive and substantial conflict with conventional wisdom about Watergate.

6.  I am the author of a book about the politics behind the investigations into the Watergate scandal, *The Secret Plot to Make Ted Kennedy President, Inside the Real Watergate Scandal* (Penguin Sentinel, 2008). I also have authored a number of essays on different aspects of the scandal that have appeared on the Internet. More recently, my presentation on the *Mysteries of Watergate* was broadcast on C-Span on September 4, 2010 and may

be viewed at http://www.c-

span.org/Watch/Media/2010/09/04/HP/A/33976/Five+Watergate+Conspiracies.aspx

7. The purpose of this Declaration is to suppoort my petition asking this Honorable Court to

order disclosure of all Watergate-related materials now in, or which later comes into, the

possession of the National Archives and Records Administration (NARA) by (i)

summarizing an alternative view of the Watergate scandal, (ii) identifying several

subsequent developments that have cast Watergate in a different light, and (iii) briefly

identifying a number of disturbing peculiarities about the Watergate investigations,

prosecutions and appeals that are deserving of further scrutiny—which can only come

from full and complete disclosure of all Watergate-related materials.


## AN ALTERNATIVE VIEW OF WATERGATE

8. The skillful exploitation of the Watergate scandal to remove a popularly elected president

is one of the great all-time acts of political chicanery.  Indeed, Chris Mathews, in a article

posted on the Internet on September 13, 2009 (*How Kennedy Brought Down Nixon*,

http://www.thedailybeast.com/blogs-and-stories/2009-09-13/how-kennedy-brought-

down-nixon/?cid=hp:blogunit1), less than a month after the death of Senator Edward

Kennedy, marveled at how Kennedy Democrats were able to engineer President Nixon's

demise without ever being identified as being responsible for engineering that outcome.

9. Richard Nixon was elected the 37th President of the United States in November, 1968,

after a tumultuous year that included assassinations of Martin Luther King and Robert F

Kennedy, widespread anti-war protests that had kept President Johnson from seeking a

second term, and the chaos of the Democratic National Convention in Chicago.  It was

also among the closest elections in history—and Nixon took office in 1969 without institutional support from other entities in the Nation's capital: the Congress and its staff, the civil service, the Capitol City's law firms and its think-tanks, and the liberal media, all remained strongly in Democratic hands and were arrayed against him and his administration. Similarly, the Federal courts remained dominated by Democratic appointees.

10. Nonetheless, Nixon's first term accomplishments included a series of dramatic achievements: In foreign affairs, these included his Opening to China, Soviet Detente, and bringing an end to the Vietnam War—which included the removal of the 500,000 troops there when he took office and the return of all our prisoners of war. In domestic affairs, he made dramatic advances in the environment, in welfare reform, in crime reduction and the reducing the scourge of drug abuse. He had named three judges to the DC Circuit Court and three to the Supreme Court, but Republican appointees remained in the distinct minority.

11. Nixon was re-elected in 1972 by a 61% margin, the second highest in history, and it seemed as though greater things lay ahead. Eighteen months later, however, he was forced to resign in disgrace over the criminal conduct, abuse of power and political dirty tricks that were disclosed during the unfolding of the Watergate scandal. With all of the institutions originally arrayed against him conducting and coordinating the investigations, his was easily the most investigated administration in history. He remains the only president to have resigned from office. How all this came about—and whether, even today, we fully understand the roles played by various individuals and entities--remains the subject of intense, ongoing debate.

12. There was certainly criminality in the Watergate scandal, but the overtly criminal acts occurred primarily at the operational level:  Gordon Liddy--and the criminal escapades he led--have no known counterpart in any prior administration.  He was caught and rightfully punished, both for the Plumbers break-in and for the Watergate break-in. Those responsible for hiring Liddy and for supervising his work– John Dean, Bud Krogh, and Jeb Magruder—also have much to answer for.  But what is so intriguing about how Watergate unfolded and later was prosecuted is that it is these very same people who not only orchestrated the cover-up, but were the first to seek plea bargains when their cover-up collapsed.  By becoming government witnesses, they avoiding harsh grand jury scrutiny of their own actions, helped cases against their superiors be maintained primarily through their testimony, and subsequently served the least sentences of the principal Watergate figures—becoming media heroes in the process.

13. The legal cases against Nixon's top aides--Ehrlichman, Haldeman and Mitchell--turned primarily on the testimony of these middle-men--Liddy's three supervisors, Dean, Krogh and Magruder—but those cases lacked substantive physical evidence.  By and large, it came down to their word against their former bosses.  Indeed, the conspiracy and perjury convictions obtained against Ehrlichman, Haldeman and Mitchell could be characterized as "thought crimes":  a finding of guilt which could only result from the juries' conclusion as to what must have been in their minds at the time of certain significant events.

14. Perhaps the real story of Watergate is how prominent alumni of the two prior administrations coordinated activities by and between the WSPF, the Senate Ervin Committee and the House Judiciary Impeachment Inquiry to allow and perhaps even to

encourage these same individuals—Dean, Krogh and Magruder--to change the initial stories they had told prosecutors, as they worked out the best way to shift the blame for their criminal acts to the real targets higher up in the Nixon administration. Prosecutors then used the vague standard of the conspiracy statutes to finesse their lack of hard evidence against Nixon's top lieutenants, even as they hid evidence of these changed stories from defense counsel in the cover-up case--and perhaps in the Plumbers case.

15. By the end of May of 1973 and before the Special Prosecutor's office had been established, federal prosecutors in the US Attorney's office had broken the cover-up and had announced they were close to bringing comprehensive criminal indictments. The WSPF, however, quickly removed those career prosecutors and postponed their promised indictments for nine more months. They assembled a staff of almost a hundred partisan Democrats, with seven of the eight most senior having worked together before in Robert Kennedy's Department of Justice. They re-directed WSPF investigations—from the Watergate cover-up—and into every aspect of the Nixon presidency. Their goal, which was certainly successful, was the destruction of that Presidency, along with ruination of its prominent members; the crippling of Republican fund-raising through FBI and IRS investigations of the GOP's most prominent contributors; and the gathering political intelligence on potential Republican presidential candidates in 1976, including files being developed and maintained on Gerald Ford, Nelson Rockefeller, Bob Dole and even California Governor Ronald Reagan.

16. They were aided and abetted in this effort by their Democratic cohorts in the Congress. And it is the actions of the Congress where full disclosure will highlight the most egregious hypocrisies. Ervin Committee hearings were little more than staged political

theater, with scripted questions and discrediting press leaks.  The Impeachment Inquiry

staff undertook almost no investigations of its own, relying instead on information

helpfully provided by WSPF staff, but did manage to suppress a requested study of

allegations of abuses of power by prior administrations-- a study that would have

undercut much of their case against President Nixon.  But it is the glaring contrast

between what was disclosed during the Ervin and Impeachment Inquiry hearings while

Nixon was still President and what was disclosed during the Church Committee hearings

beginning but a year later, that documented governmental abuses of power in every

administration stretching back to 1936.  Literally hundreds of people in and about the

Nation's capital knew of these prior abuses, including many who were so eager to

prosecute Nixon, yet it served their political agenda to leave those stones unturned and

those stories untold.

17. The Watergate criminal trials themselves cannot withstand close scrutiny—and legal

    scholars will someday condemn the many abuses that were condoned in the rush to obtain

    convictions of Nixon's principal aides.  Even Republicans are supposedly guaranteed the

    rudiments of due process in criminal trials, but disclosure will show that these were all

    but ignored in the cover-up and Plumbers trials conducted by WSPF prosecutors.

18. To those caught up in the pogrom that the Watergate investigations and prosecutions

    became, it must have seemed like Koestler's *Darkness at Noon*, as their ability to

    research documents and mount a defense was effectively curtailed, their reliance on

    precedent was dismissed without consideration, and the many unsupported assertions

    contained in the testimony of their former underlings (who had become their principal

    accusers) was accepted as un-controvertible fact by highly biased and tainted DC juries.

19. Disclosure of the requested Watergate-related materials can be expected to shed further light on these allegations and help resolve the question of whether it was really President Nixon who was acting as though he were "above the law". Full and complete disclosure is the best answer—perhaps while those are still alive who lived through the hysteria and know where to look--and then let the historians loose.

## TROUBLING SUBSEQUENT DEVELOPMENTS

20. For all the hand-wringing of Democrats whose party had lost the White House and the hype of the liberal media during the unfolding of the Watergate scandal, there are several troubling developments that followed President Nixon's resignation that raise questions that threaten the conventional wisdom about the significance of the that scandal.  Mention of these may best make the case for the need for—and appropriateness of--further disclosures.

21. Prosecutorial and Judicial Misconduct During the Cover-up Trial:  With Nixon out of office, but also out of reach because of President Ford's pardon, the last legal hurdle was the securing of convictions of his top lieutenants—Ehrlichman, Haldeman and Mitchell. This was quickly accomplished--but recently uncovered evidence suggests these convictions were obtained in a travesty of injustice, where the Constitutional guarantees of due process were swept aside:  The indictments were for conspiracy and perjury, essentially "thought crimes" requiring little evidence—since what evidence there was tended to implicate the middlemen—particularly Dean and Magruder--who had already become government witnesses.  Indeed, the whole case against their superiors turned on their testimony—but evidence now suggests  their stories had changed dramatically from

when they first approached career prosecutors, the details about which were deliberately

and improperly kept from defense counsel.  As presiding judge, Sirica was neither fair

nor impartial--and what has now come to light about his efforts to bolster Dean's

credibility through a temporarily harsh sentence border on defrauding the jury.  The

District of Columbia jury itself was both hopelessly tainted by the scandal's massively

adverse  pre-trial publicity and totally biased against Republicans in general and against

Nixon's aides in particular.  To top it all, the Special Prosecutor's initiative already had

stacked the deck for judges considering any appeals.

22. Subsequent Church Committee Disclosures:  Less than a year after Nixon was forced

   from office, hearings conducted by the Senate's Church Committee resulted in

   disclosures of governmental abuses of power and political dirty tricks stretching back to

   1936.  Book II of its Final Report, entitled *The Growth of Domestic Intelligence:  1936 to

   1976*, along with its 681 footnotes and related public hearings, documented intrusions

   into the lives of Americans by the FBI, the CIA and military intelligence organizations

   that make what was contemplated by the Nixon Administration seem miniscule by

   comparison.  Yet, no Watergate sagas has seen fit to mention this anomaly.

23. The Role of Divided Government:  Successful exploitation of the Watergate scandal,

   principally through Congressional investigations and use of a special prosecutor (so

   eloquently criticized by Judge Silberman in IN RE SEALED CASE 838 F.2d 476 (1988),

   appears to have established a disturbing pattern in American politics that has continued to

   this day:  Each and every time a second-term president has been faced with a hostile

   Congress—one totally in the control of the other party--a scandal of national significance

   has followed that has threatened the very core of that presidency:  (i) President Reagan

was the "Teflon president" until he lost the Senate in 1986 and the Iran-Contra scandal

soon followed.  (ii) President Clinton lost control of both houses of Congress in 1994, but

was re-elected—only to be impeached over the Whitewater/Lewinski affair in his second

term. (iii) President Bush lost control of both houses of Congress in 2006 and saw his

second term all but ruined by investigations of the Valarie Plame affair and the firing of

the eight US Attorneys.  Watergate's claimed uniqueness is undercut by this subsequent

and consistent pattern of a hostile Congress and use of partisan special prosecutors to

effectively undercut an elected president's ability to govern.   Indeed, the pattern tends to

suggest something of a structural weakness in our constitutional form of government,

rather than a recurring pattern of individual wrongdoing.


## ITEMIZATION OF TOPICS RIPE FOR INQUIRY

24. With these subsequent developments in mind, it might be helpful briefly to identify the

series of disturbing peculiarities that call out for closer scrutiny—which can only come

with disclosure of all Watergate-related materials.

### BREAK-IN AND COVER-UP ISSUES

25. Sirica's Unique Background and Judicial Temperament:  "Maximum John" Sirica was

said to be the most reversed judge of the DC District Courts before he became Chief

Judge (by seniority) and appointed himself to preside over both the break-in and cover-up

trials.  Nixon's critics are quick to point out that he was appointed by President

Eisenhower and nominally a Republican—conveniently ignoring the fact that Sirica so

creditedEdward Bennett Williams, among Washington's most prominent Democrats and

then counsel to the Democratic National Committee, with salvaging his career that he

named him god-father to his first-born son.  Sirica's obituaries presented a more balanced

view of his controversial rulings in criminal trials, but *Time* magazine already had named

him 1974 Man of the Year for his conduct of the break-in trial.  Perhaps the most

astonishing material regarding Judge Sirica, his background and trial conduct, is to be

found in the last chapter of Renata Adler's book, *Canaries in the Mine Shaft* (2001),

entitled, *A Court of No Appeal*.  It details the savage reaction that followed her

observation that, while working as editor of *The New Yorker* in 1979, she declined to

review Judge Sirica's own Watergate book, *To Set the Record Straight*, because :

> [C]ontrary to his reputation as a hero, Sirica was in fact a corrupt, incompetent,
>
> and dishonest figure, with a close connection to Senator Joseph McCarthy and
>
> clear ties to organized crime.

This chapter, her detailed and well documented reiteration of the criticisms that followed,

then presents her justification for making such a statement: a twenty-five page romp

through Sirica's life and times, including allegations that Sirica's boxing career had been

encouraged and supported by organized crime, that he had deliberately lost dozens of

Prohibition cases while working in the US Attorney's office because his father's barber

shop (over which Sirica lived with his family at the time) was a well known source for

illicit liquor, and detailing Sirica's sentencing abuse of Gordon Liddy, whom he kept in

the DC Jail—as opposed to Federal prison--for over five years.  Her chapter ends with the

assertion that Sirica had been indicted for fight-fixing and consequent tax evasion for his

involvement in the 1927 Dempsey-Tunney fight, the fight of the "long count".  Adler

adds that the indictment was sealed and the case never went to trial, but that information

regarding it was developed by the Criminal Investigative Division of the IRS in an
historical study prepared for internal use.

Adler's work is well worth reading—and it would be interesting to see if any materials in
NARA's possession come to light to bear her out.

26. <u>Grand Jury Deliberations Resulting in September 15, 1972 Indictments</u>:  When the break-
in indictments were handed down on September 15, 1972—and focused only on seven
burglars—Earl Silbert wrote a memo to Henry Petersen saying this was all they could
support at the present, and that their plan was to convict these people and see if their
stories changed when they were facing long prison sentences.  Their approach clearly
worked.  The question is, what had Grand Jury I been told, knew or suspected at the time
those original indictments were handed down---and how did that change over the ensuing
two years?

27. <u>Mollenhoff's Undue Influence on Sirica</u>:  In his book, *Game Plan for Disaster* (1976),
Clark Mollenhoff describes how he met privately with Judge Sirica and importuned
him—not to act as an impartial judge in the upcoming Watergate break-in trial—but to
dedicate himself to pursuing the truth about who knew of the planned break-in.
Mollenhoff goes on to say how he then wrote several newspaper columns predicting
Sirica would take this approach—and lauding him for it.  It would be interesting to see if
there are any records of Sirica exploring this idea with prosecutors, his clerk or other
judicial personnel.

28. <u>Sirica's *Ex Parte* Trial Advice to Silbert</u>:  In his book, *To Set the Record Straight* (1979),
Judge Sirica details how he took Earl Silbert aside and instructed him on how to conduct
the Watergate break-in trial—even going so far as to thrust hearing records into Silbert's

hands that detailed how Sirica had responded in a similar situation in the course of

Congressional hearings.  If disclosed, as this highly improper initiative should have been,

Sirica would have had to recuse himself from trying the case and the course of history

would have changed considerably.  It would be interesting to see if there are any other

records of this event or whether Silbert mentioned this to his colleagues or to Grand Jury

I.

29.  Sirica *Ex Parte* Meeting with Sam Dash—In his book, *Chief Counsel, Inside the Ervin*

*Committee—the Untold Story of Watergate* (1976), Sam Dash details how he called upon

Judge Sirica, after he had been appointed the Committee's chief counsel, and importuned

him to impose sufficiently harsh provisional sentences such that the break-in defendants

would be encouraged to cooperate with the Senate's investigation.  Sirica did, indeed, do

as Dash had suggested, explicitly stating that any possible reduction (in sentences that

would stretch for over thirty years) would be conditioned upon the defendant's

cooperation with the Ervin Committee—an unprecedented court intrusion in support of a

Congressional investigation.  If this highly improper meeting had been disclosed, Sirica

would not have been allowed to sentence these defendants and would have not been able

to appoint himself to preside at the cover-up trial.  It would be interesting to see if any

further mention of this meeting is made in either the Ervin Committee records or in

Sirica's judicial notations.

30.  Sirica Interactions with Grand Juries I, II and III:  As Chief Judge, Sirica had oversight of

grand jury issues.  Was he familiar with the ongoing work of any or all of the Watergate

grand juries?  How often did he meet with prosecutors to discuss grand jury progress?

Did he appear before any of the grand juries—and, if so, what did he say?

31. Sirica *Ex Parte* Meetings with WSPF Prosecutors:  In his book, *Not Above the Law:  The Battles of Watergate Prosecutors Cox and Jaworski* (1977), James Doyle observes that Jaworski was meeting privately with Judge Sirica.  In his own book, *The Right and the Power* (1977), Leon Jaworski assures his staff that Sirica would never accept an actual grand jury indictment of President Nixon.  How could he have known that if not from meetings with Sirica?

32. Promise of Comprehensive Indictments:  The US Attorney for the District of Columbia, Harold Titus, issued a press release on May 24, 1973, predicting comprehensive Watergate cover-up indictments in sixty to ninety days.  Yet, the three assistant US Attorneys who had conducted the Watergate investigation since the break-in arrests (Earl Silbert, Seymour Glanzer and Douglas Campbell) were forced to resign from the case by the newly established Watergate Special Prosecution Force a month later (June 30th) and the promised comprehensive indictments were not forthcoming for another nine months (March 1, 1974).  Was the grand jury close to indicting before appointment of Archibald Cox as Special Prosecutor?  Was the case that had been presented by the career federal prosecutors different from that ultimately brought by the WSPF?  How did the WSPF handle the removal of the original prosecution team before Grand Jury I?

33. Dean's Changing Story and Integrity as a Witness:  Dean or his counsel met with federal prosecutors some eight separate times in the month following the collapse of his cover-up—and his story changed dramatically over that period.  The extent and impact of these changes is discernable from the Denny/Rient memo of November 15, 1973, now in WSPF files but which has been reproduced in full as Appendix U to my book mentioned earlier.  None of this was shared with defense counsel as required by law.  The

implications for Nixon, Haldeman and Ehrlichman—and the validity of the cover-up trial

convictions—is further detailed in my Mysteries of Watergate broadcast mentioned

earlier. It would be instructive to compare Dean's "escalating" story with the grand jury

testimony of other Watergate witnesses and to see if Dean's initial version of events is

not much closer to their testimony, too. It also will be interesting to see if grand jury

testimony adds more information to that contained in *Silent Coup: The Removal of a

President* (1991) by Len Colodny and Robert Gettlin.

34. <u>Dean's Faulty Ervin Committee Testimony</u>: John Dean's testimony before the Ervin

Committee began on June 25, 1973, before the existence of the White House taping

system became known. One of the primary reasons for the public transcript release of

April 30, 1974, by the White House was to prove Dean's allegations were wrong.

Indeed, the White House issued a release documenting some nineteen instances where

Dean's testimony conflicted with or was not supported by the tapes. The WSPF then

conducted their own review, resulting in an internal memo listing almost as many

instances, although somewhat differing in context. Was Dean asked about any of these

instances in his grand jury appearance(s)? If Dean had appeared, as agreed with career

prosecutors, before Grand Jury I on May 5, 1973, his questioning might have been rather

thorough. What was the tenor of the questions when brought before that same grand jury

by the WSPF?

35. <u>Magruder's Changing Story and Integrity as a Witness</u>: Jeb Magruder, along with John

Dean, was heavily involved in the cover-up and agreed quite early on to plead to a single

felony and become a government witness. Since he had had no direct contact, however,

with President Nixon or his two top aides (John Ehrlichman or Bob Haldeman), during

the cover-up, his testimony was of limited value.  He was, nonetheless, the only other individual who could shoulder some of the prosecution's case in addition to John Dean. It is said that Magruder appeared before the grand jury on no less than five occasions and was interviewed by various WSPF prosecutors almost a dozen times.  Under this pressure, and seemingly eager to testify to whatever the WSPF wanted, Magruder became a highly unreliable witness.  Fred Buzhardt told me that he had been told by WSPF attorneys that they were not at all sure they could put Magruder on the stand in good faith because they were not sure whether he intended to tell the truth—or could even remember what actually had happened.  Indeed, the internal forty-two page WSPF memo, entitled JEB STUART MAGRUDER – DIRECT TESTIMONY,  prepared for use in guiding Magruder through his cover-up trial testimony identifies some four dozen separate instances where what Magruder was expected to say might conflict with his prior sworn testimony before a grand jury or the sworn testimony of other government witnesses.  It also specifically identifies potential weaknesses, including (i) "Prior perjuries and inconsistencies with himself and others" and (ii) "Suggestabililty – says what you want, what others suggest, what will help him.  Confabulation."  None of this was ever shared with defense counsel, as required by law.  It will be most interesting to see how this was handled, if at all, with Grand Jury I, II or III—and to compare Magruder's actual trial testimony with what had been told to the grand jury by Magruder and other government witnesses.

36. <u>Mitchell's Alleged Plan Approval</u>:  One of the acknowledged Watergate ambiguities is whether Mitchell actually approved Liddy's scaled down intelligence plan during his Miami meeting of March 30, 1972 with Magruder and LaRue.  Magruder, who already

had disbursed $37,000 to Liddy in furtherance of his intelligence plan (and who was in physical fear of Liddy's anger at possible hearing that approval had again been postponed), emerged from that meeting acting as though the plan had been approved. Mitchell devoted considerable time at the cover-up trial in maintaining that he had never approved the plan. LaRue, also a government witness, agreed with Mitchell. At some point in his dealings with prosecutors, Magruder advanced the idea that LaRue had stepped out of the meeting to take a phone call and suggested that it might have been at the point when he secured Mitchell's approval. It would be interesting to track just when Magruder first mentioned this idea and how the whole matter was handled before Grand Jury I—and otherwise to compare and contrast the testimony of Magruder and LaRue. It also will be interesting to see if grand jury testimony adds any more information to that contained in *The Strong Man, John Mitchell and the Secrets of Watergate* (2008) by James Rosen.

37. Nixon as Unindicted Co-Conspirator: The March 1, 1973 comprehensive cover-up indictments also named President Nixon as an unindicted co-conspirator, even though Archibald Cox had announced early on that his office did not have the authority to indict a sitting president. Do the records show how this change came about? Was the President an unannounced target all along? What was Grand Jury I told about Nixon's involvement?

38. The "Roadmap": The March 1, 1973 comprehensive cover-up indictments also contained the infamous "Roadmap" along with the request that Judge Sirica order it delivered to the House of Representatives. The "Roadmap" itself has never been revealed, but is said to be a fifty-five page document setting forth a series of events that might lead the House to

conclude the President had committee "High Crimes and Misdemeanors" that would be cause for impeachment.  Our Constitution appears to assume that the House of Representatives would conduct its own investigation into whether the President had committed an impeachable offense.  Who really drafted the "Roadmap"?  How was this handled before Grand Jury I?

39. "Roadmap" and Abuses of Power:  Curiously, none of the WSPF task forces were dedicated to compiling the alleged abuses of power that formed the basis of the second Article of Impeachment recommended by the House Judiciary Impeachment Inquiry.  It will be interesting to see whether any such information was ever presented to Grand Jury I and whether it was reflected in the "Roadmap"—as well as how the "Roadmap" was received and utilized by the Impeachment Inquiry staff.

40. Abuse of the Grand Jury Process:  It has been said that one of the by-products of grand jury secrecy is that any prosecutorial abuse of the grand jury process is kept from the public eye.  There were plenty of allegations of such abuse.  See, for example, *The Terrors of Justice* (1978) by Maury Stans.  At least one NARA archivist has observed that it appears the Rosenberg prosecutors "went way over the line" in their use of grand jury powers.  Given the scorched earth nature of the highly politicized WSPF investigations, it might be instructive to see how they wielded the awesome grand jury powers at their disposal—and who they wielded them against.

41. Approval for Payment of Hunt's Blackmail Demand:  In their book, *Stonewall: The Real Story of the Watergate Prosecutions* (1977), former WSPF prosecutors Ben-Veniste and Frampton outline how certain they were, following the release of the transcript of John Dean's "Cancer on the Presidency" meeting of March 21, 1973, that Haldeman had

phoned Mitchell to authorize payment of Hunt's blackmail demands. This supposed version of events is identified by Leon Jaworski in his book, *The Right and the Power: The Prosecution of Watergate* (1977), as well as by Judge Sirica's clerk, Todd Christofferson, as being the singular proof that led both Jaworski and Sirica to conclude (upon the transcript's release on April 30, 1974) that Nixon was guilty of leading the cover-up. Yet Fred LaRue, also a government witness, had told WSPF prosecutors that he had obtained Mitchell's concurrence for a partial payment on the previous day. It would be most instructive to see how this matter was handled before Grand Jury I and whether Sirica's court records contain any mention of this.

42. <u>Nixon's Reaction to "Cancer on the Presidency" Meeting</u>: Much has been made of John Dean's statement to President Nixon on the morning of March 21, 1973, saying it seemed as if there were a cancer on the presidency. Yet, three things seem abundantly clear from the tapes of four key meetings that occurred at the very height of the alleged Watergate cover-up (Nixon/Ehrlichman the evening of Monday, March 19th; Nixon/Dean the morning of Wednesday, March 21st; Nixon/Dean/Haldeman/Ehrlichman that same afternoon; and Nixon/Dean/Haldeman/Ehrlichman/Mitchell on Thursday afternoon, March 22nd): First, Nixon's reaction to Dean's revelations of Hunt's blackmail demands is to call for another grand jury investigation—in order to have the adverse disclosures that are sure to come occur in the relative secrecy of the grand jury rather than be selectively leaked by the Ervin Committee. Second, given the tone and demeanor evident from these four conversations, it is difficult to maintain that any conspiracy to obstruct justice was underway. Third, and most telling, it also is quite clear that none of the other participants had any idea of the extent and magnitude of the criminal activities John Dean

had undertaken in furtherance of his cover-up (which included not only obstruction of justice, but subornation of perjury, improper release of government investigative information, destruction of evidence, and embezzlement). It would be interesting to see what use WSPF prosecutors made of these particular tapes and whether the information and relative conduct of the involved parties was reviewed with the grand jury.

43. Destruction of Howard Hunt's Hermes Diaries: Howard Hunt is said to have insisted to Grand Jury I, when brought back before them following his conviction in the break-in case, that his detailed diaries, among other things, had been secreted in his White House safe—even though Dean had insisted he had turned over all the contents to the FBI. What did Hunt say was in these Hermes diaries? When Dean finally admitted to WSPF prosecutors that he had destroyed this evidence, did they ever mention this act to Grand Jury I?

44. Parkinson's Indictment as Mercy Bait: In his book, *Blind Ambition* (1976), John Dean expresses great surprise as the inclusion of Ken Parkinson in the comprehensive Watergate cover-up indictments of March 1, 1974, and says he knew of five or six others whose involvement was far greater. He says his defense counsel, Charles Shafer, explained that occasionally prosecutors include someone obviously less culpable so that, when that individual is acquitted by a jury, it will tend to bolster the integrity of the remainder of their verdict. Shafer called this practice "mercy bait". It will be interesting to see what Grand Jury I was told about Parkinson's involvement and how his indictment was handled.

45. Omission of William Bittman Indictment: Hunt's attorney, William Bittman, was a hero of Robert Kennedy, since he (along with James Neal, head of the WSPF Watergate Task

Force and Charles Shafer, Dean's defense counsel) had secured a long-sought conviction of James Hoffa. Yet, Hunt was heavily involved in the cover-up, handling hush money payoffs, relaying Hunt's demands to others involved in the cover-up, and secreting evidence of Hunt's bribery attempts from WSPF prosecutors. It was the unanimous vote of the entire Watergate Task Force (when James Neal was not in charge) that he be named in the comprehensive Watergate cover-up indictment of March 1, 1974—and again in 1975, when his non-cooperation became known. Bittman's possible indictment is listed as an agenda item for discussion some twenty-two times, but he was never actually indicted. It will be instructive to see what, if anything, any of the Watergate grand juries were told about Bittman and his involvement.

46. McCord Credibility Before Grand Jury: James McCord's letter of March 19, 1973, when disclosed by Judge Sirica on March 23rd, has long been credited with causing the cover-ups collapse. Yet, sources have suggested that he could produce no specifics to back up his allegations—and was, quite simply, not believed when brought back before Grand Jury I. It would be interesting to see how this was handled by the career prosecutors—and the grand jury.

47. McCord's Unexplored Cover-up Allegations: James McCord later sought a reversal of his break-in trial conviction due to improper conduct by his initial criminal defense counsel, whom McCord suggested had been importuned by others engaged in the cover-up to plead guilty rather than stand for trial—and that WSPF attorneys maneuvered to keep him and this information from the Grand Jury I. There seems to be reason to believe his story. It would be interesting to see whether his allegations of grand jury abuse are verifiable.

48. Abuse of Conspiracy Statutes:  Civil libertarians have long worried that the conspiracy

statutes are far too imprecise and allow prosecutors to bring cases they otherwise would

not be able to maintain.  It would be interesting to track how the idea of a cover-up

conspiracy first emerged and how it was handled before Grand Jury I.  It is quite clear

from the prosecutors' notes, as well as from their recollections reflected in the Denny-

Rient memo of November 15, 1973, that Dean did not allege a conspiracy when he first

approached prosecutors in April of that year.  In point of fact, his story changed

dramatically over the course of that first month, never actually getting around to

involving Ehrlichman, Haldeman or Nixon until the end of April, after some five or six

meetings with prosecutors.  One can only wonder how this was handled before Grand

Jury I.

49. Destruction of Evidence:  The Uher 5000 Cleaning and Repair:  One of the reasons that

no indictments were forthcoming from the 18 ½ Minute Gap was because the panel of

tape experts, noticing the Uher 5000 tape recorder acting strangely, arranged to have it

cleaned and repaired.  Among other things, a faulty bridge rectifier was replaced and the

broken part thrown out.  That cleaning and repair ended any idea of the tape recorder

being used as evidence, essentially ruining any hope of prosecution.  It will be interesting

to see how this oversight was handled, if at all, before the grand jury—and whether that

same grand jury was ever asked to indict anyone at all.

50. Sirica's Jury *Voir Dire*:  It has been said that Judge Sirica was so eager to assure the

cover-up trial would not be moved outside his jurisdiction that he took it upon himself to

conduct the voir dire in the privacy of his chambers—assuring everyone that he could

seat a politically unbiased jury that had not been tainted by the massive pre-trial publicity

that accompanied the unfolding of the Watergate scandal.  It later developed that one of

his chosen jurors neither spoke nor understood the English language—and he was quietly

dismissed and the incident sealed from disclosure.  One has only to read Judge

MacKinnon's dissent in US v Haldeman, et al, 559 F2d 31 (1976) to appreciate the extent

and probable impact of pre-trial publicity on DC jurors.   It would be interesting to

review the nature and extent of Sirica's jury *voir dire*—for both the break-in and the

cover-up trials—to ascertain just how mindful he was in seating unbiased and untainted

jurors.

51. Sirica's Temporary Sentence for John Dean:  When Dean's plea agreement was

formalized on October 19, 1973, when he plead guilty to a single felony in exchange for

becoming a government witness, sentencing was postponed until after the cover-up

trial—the usual and customary treatment.  Shortly after the acquittals of Maurice Stans

and John Mitchell in the Vesco trial in New York, where jurors said they did not find

Dean's testimony credible, Sirica hurriedly sentenced Dean to a prison term of one to

four years—with incarceration to begin the opening day of the cover-up trial.  In their

subsequent books, both Sirica and Ben-Veniste noted how important Dean's being

sentenced had  been to the credibility of his testimony.  Yet, one week following the

conviction of Ehrlichman, Haldeman and Mitchell on all counts in that trial, Sirica

reduced the sentences of both Dean and Magruder to "time served"—thereby reducing

the sentences of the WSPF's two key witnesses—and the two most involved in the actual

cover-up--to the least of any of the major Watergate figures.  The implications of Sirica's

actions as amounting to a fraud on the jurors is detailed in my Mysteries of Watergate

presentation mentioned earlier.  It would be interesting to compare grand jury and court

materials to see if any further information comes to light regarding WSPF and Sirica actions in this matter.

52. Hush Money v. Humanitarian Aid:  The most damning evidence presented at the cover-up trial had to do with the payment of alleged hush money to the Watergate burglars. Even the WSPF prosecutors conceded at trial that every dollar that was disbursed was in response to invoices submitted for legal defense costs and for humanitarian aid.  It became a jury question, however, because the government's principal witness—John Dean—swore the real purpose of the payments was to assure their continued silence, which it certainly was *for him*.  But it was not the payments themselves that proved so damning; it was the secretive method of delivery—in cash, at night, in mail drops, and through intermediaries (principally Hunt's spouse).  The key question, however, is whether and to what extent Nixon's top lieutenants were ever informed of this surreptitious method of delivery.

53. Abuse of Prosecutorial Discretion:  The loss of Archibald Cox as Special Prosecutor in the Saturday Night Massacre is said to have resulted in a near-total change of prosecutorial attitude by his remaining WSPF staff, which his replacement was unable or unwilling to counter.  What might have been a more even-handed approach to those on the periphery of the cover-up became a scorched earth policy.  Disclosure of grand jury material may well provide more insight into this change of attitude.  Were agreements abrogated and those who had not been in the target area suddenly thrust into the danger zone?  Were statutes selectively enforced?  Were similarly situated potential defendants treated differently?

54. <u>Character Assassination of Henry Petersen</u>:  One of the greatest injustices perpetrated by WSPF prosecutors was the systemic destruction of the reputation of Henry Petersen, the distinguished career prosecutor who had become the assistant attorney general in charge of the criminal division.  Petersen had had the unpleasant task, before the full extent of criminality was known, of persuading President Nixon that he had to remove Haldeman and Ehrlichman from his White House staff.  For that task, and because WSPF prosecutors needed to undercut the credibility of prior Watergate investigations (in spite of an early memo by James Neal saying they actually had done a very professional job), the WSPF had Petersen brought before the grand jury—and leaked that fact to the public. It would be most interesting to see how all this was handled.

55. <u>Use of Tape Transcripts</u>:  The quality of the White House tapes, particularly recordings that occurred in the President's EOB office, is quite poor—and many portions are simply unintelligible.  As a consequence, disputes over accuracy of written transcriptions were bitterly fought then—and continue to this day.  By the end of 1974, there were at least three versions:  the transcripts released by the White House on April 30, 1974, those released by the House Judiciary Committee, dated May-June, 1974, and those prepared by the FBI for use in prosecutions by the WSPF.  The transcript of Nixon's "Stonewall" discussion with John Mitchell on March 22, 1973, is particularly in question, since it appears the WSPF chose not to use the FBI transcription at the cover-up trial—preferring the version released by the House Judiciary.  It would be interesting to know which tapes were played to any of the grand juries, which transcripts were provided as listening aides, and whether the source of those transcripts was ever disclosed.

56. <u>Investigation of White House Transcripts</u>—According to the WSPF Report, dated

October, 1975, after Nixon had resigned and after his top lieutenants had been convicted

in the cover-up trial, WSPF prosecutors launched an investigation in January, 1975, of

how the White House transcripts had been prepared—in essence, launching a new and

separate investigation of the conduct of Nixon's defense counsel.  No indictments

resulted and the matter eventually was dropped, but it might be revealing to see if—and

how—any grand juries were utilized in this apparent vendetta against those daring to

defend President Nixon.

57. According to public pronouncements, Grand Juries II and III were utilized in support of

investigations by the four non-Watergate task forces—on campaign finance, political

dirty tricks, the Plumbers, and the ITT donation—so the following topics should have

received their consideration.

THE PLUMBERS CASE

58. <u>The Plumbers Investigation and Prosecution</u>:  The WSPF investigations, indictments and

trial tactics of the Plumbers case against John Ehrlichman is a microcosm of the same

sort of prosecutorial misconduct that occurred in the cover-up case.  Judge Gesell's

conduct of the trial was neither fair nor impartial; the District of Columbia jury was both

tainted and biased, and the prosecution was not remotely even-handed.  In essence,

Ehrlichman had approved a "covert operation", under the existing national security

exemption, designed to discover whether Daniel Ellsberg had confided his plans for

release of other classified documents to his psychiatrist, Dr. Lewis Fielding.  Ehrlichman

based his entire defense on the fact that he had approved a covert operation, but not

necessarily an illegal one, and was not informed of any other details.  Later disclosures

before the Church Committee seem to show this was hardly an extraordinary act—and that the FBI had undertaken an average of one hundred twenty-five such "black bag" jobs each year since World War II.

59. <u>Analysis of Krogh and Young Testimony</u>: Co-Plumbers Egil Krogh and David Young were the principal witnesses against Ehrlichman at the Plumbers trial before Judge Gesell. The central question is, "How much detail of their planned operations had they shared with Ehrlichman?", who claimed consistently and from the very outset that he had had no knowledge of the details of the intended operation. It would be interesting to compare their WSPF interviews, grand jury and trial testimony and subsequent writings to see how their stories evolved. It certainly appears that all anyone above Liddy had intended was an illicit entry—and that the decision to force the entry and trigger the resulting police report was made on the spot by Liddy when his cohorts could not pick the lock to Dr. Fielding's office. Indeed, it is entirely possible that Ehrlichman was never informed that the Plumbers did not intend to use the FBI for the intended entry.

60. <u>Negotiations Regarding Krogh Plea</u>: Krogh and Young were Co-Plumbers, but treated quite differently by WSPF prosecutors: Krogh pled guilty to violating Fielding's civil rights—the same charge being brought against Ehrlichman—but Young was not prosecuted at all. The difference, apparently, is that Krogh lied in his initial grand jury appearance when the case was being investigated by career prosecutors—essentially denying he knew of Liddy's trips to Los Angeles to do the Fielding break-in. How Krogh came to plead to the more difficult offense to prove—but one far more helpful to WSPF's prosecution of Ehrlichman—is worthy of much closer study. What was the grand jury told, if anything, about the differences between Krogh and Young? Did the

grand jury actually indict Krogh—and what was it told—or did Krogh work out his plea just with WSPF prosecutors entirely apart from grand jury involvement?

61. Gesell Trial Demeanor:  Judge Gesell's distain for Ehrlichman—particularly his demeanor during Ehrlichman's testimony—was so intense that it was the subject of a PBS radio commentary, leading to an unsuccessful challenge to Gesell's impartiality as presiding judge.  It would be interesting to review the court's own records in this regard.

62. Denial of National Security Defense:  A letter was produced from the Department of Justice to the effect that, while admitting the FBI had undertaken illicit entries in the past under a national security exemption, such actions had only been done on rare occasion and under stringent guidelines that included the express consent of the Attorney General. As such, Ehrlichman was not allowed even to present a national security defense at trial or to raise it on appeal.  Yet, disclosures before the Church Committee—particularly the testimony of FBI agents Courtney Evans and Cartha DeLoach—indicate quite clearly that only telephone taps required the express approval of the Attorney General (which occasionally was obtained after the fact), and that the FBI undertook "surveillance"—a term of art that included illicit entries for the purpose of gathering information and the planting of bugging devices--on almost a routine basis, which included actions taken at the instruction of White House aides claiming to be acting on the authority of President Kennedy or Johnson.  It would be interesting to see how this was handled before the grand jury, especially in Ehrlichman's testimony in May, 1974, as well as before Judge Gesell at the trial and on the subsequent appeal.

63. Denial of "Mistake of Fact" Defense:  WSPF prosecutors even went so far as to deny Ehrlichman, with Gesell's approval, the right to offer at trial a mistake of law defense:

that he *thought* he had the authority to request surveillance of Dr. Fielding.  Again, it would be interesting to trace the evolution and treatment of this defense—especially when there must have been dozens, if not hundreds, of alumni from prior administrations who knew of the opposite practice.

64. Covert as *Per Se* Illegal:  At the conclusion of the Plumbers trial, Judge Gesell ruled that it did not matter whether Ehrlichman knew an illegal entry was planned—that it was enough to violate the statute if any undisclosed governmental action was undertaken without a court-approved warrant—ruling, in essence, that "covert" was *per se* illegal. Given the disclosures before the Church Committee that began less than a year later— and involved thousands of undisclosed government actions by the FBI, the CIA and various military intelligence organizations—one can only marvel at how the Department of Justice could stand idly by, allow Gesell's ruling to go unchallenged, and even to support it on appeal.

CAMPAIGN FINANCE

65. Purchase of Influence Allegations:  The WSPF Report dated October, 1975, appears to state that thorough reviews were undertaken of some twenty-five regulatory actions in the hopes of identifying any that may have been influenced by improper campaign contributions.  No actions were ever brought.  It would be interesting to see if any information from this multitude of investigations—which some might characterize as pure "fishing expeditions"-- was ever presented to Grand Juries II or III.

66. Prosecutorial Discretion and Selective Prosecutions:  The Campaign Finance Task Force undertook investigations and prosecutions under both the new campaign finance law, taking effect on April 7, 1972, and the one it repealed and replaced—even though some

prosecutions under the latter had nothing whatsoever to do with the Watergate scandal.  It

would be interesting to track how they went about this, whether and how they utilized

any grand juries in their investigations, and whether there was any comparable

investigation of transgressions by Democratic candidates—in the 1970 or 1972

campaigns.

67. The Townhouse Project:  The Nixon White House undertook an initiative to channel

financial support to certain Republicans in the 1970 mid-term elections, which was

known as the Townhouse Project.  While having nothing to do with Watergate, WSPF

attorneys conducted extensive investigations, which included sending FBI and IRS agents

to interview some one hundred and thirty prominent Republican contributors who made

contributions to this effort.  The basis for the investigation and the threatened prosecution

was that the Townhouse Project's campaign committee had been operating without a

valid treasurer, which was a violation of a federal statute that had been repealed and

replaced in 1972.  Congressional hearings when considering the new law included

testimony by the Department of Justice that the prior statute was unenforceable, that the

Department had followed a policy of "non-enforcement" for decades, and that no case

had been brought under the statute since 1934.  WSPF files contain a memo from task

force head Charles Ruff, suggesting that under modern case law, no specific guilty intent

(i.e.: *scienter*) would be required for violation of that statute, and that the presumption

that one intended the natural consequences of his actions would suffice to meet the law's

requirement.  The FBI/IRS interviews certainly had their intended chilling effect on

prominent Republican contributors, even though no prosecutions ended up being brought.

It would be interesting to see how much of this was presented to, or shared with, Grand Juries II and III.

68. <u>McGovern's Campaign Finance</u>:  There were allegations of financial irregularities and questionable practices by McGovern's campaign and its DNC support, too—particularly involving the use of hundreds of separate committees to avoid disclosure.  It would be interesting to see if any were pursued to the point of presentment to the Grand Juries II and III—and if grand jury members ever inquired as to why they were only being told of Republican transgressions.

69. <u>Corporate Contributions</u>:  Archibald Cox announced an amnesty program for corporations who had made illegal contributions to the 1972 campaign—and several came forward.  There were only a handful of actual prosecutions, but all for donations to Republicans.  The GAO did make a series of referrals of Democratic cases it had come across, but none were ever prosecuted.  It would be interesting to see how all this was treated before Grand Juries II and III—and whether any information regarding possible Democratic transgressions was ever pursued or presented.

70. <u>Stans' Allegations of Prosecutorial Abuse</u>:  In his book, *The Terrors of Justice* (1978), Maury Stans details the all-out effort to investigate and prosecute him and his campaign finance committee for violations—without success.  All the press speculation and reports

> [T]urned out to e pure fiction, absolute hogwash.  The Watergate Special
> Prosecutor investigated "several hundred" such accusations, through thousands of
> interviews and subpoenas for thousands of documents, using his own
> organization, the Internal Revenue Service, the FBI, the computerized records of
> data gathered by the Senate Watergate [Ervin] Committee, and information from

members of Congress.  After two years of ferreting out the facts, he announced in

his final report that he could not find evidence adequate to take to court a single

instance within this entire range of alleged corrupt practices.

Insofar as the Nixon money-raising in 1972 was concerned, there were only a

handful of nonwillful technical violations and these were less significant

individually and in the aggregate than similar oversights and violations by a

number of other candidates who were not prosecuted.

That was the surviving sum and substance of all of the alleged financial

corruption in the 1972 Nixon campaign.  Not a single proved case of corrupt

action.  No favors granted.  No contracts awarded.  No cases fixed.  No

ambassadorships sold.  No illegal contributions from foreigners.  No overseas

laundries.  No illegal solicitations.  No list of companies in trouble with the

government.  No enemy lists.  No fund-raising by government officials.  No

extortion or coercion.  No intentional circumvention of the law in a single

instance.  That is precisely what the Department of Justice, the Special

Prosecutor, and the Courts found.

But the book also details the massive efforts by WSPF prosecutors to find something,

anything, to justify the extent of their two year investigation—hence his title, The Terrors

of Justice.  In the end, it appears Stans plead to two nonwillful, technical violations, but

even that was followed by further wrangling over whether he had opened himself to

possible incarceration.  It would be interesting to track his allegations against

investigations by and presentments to Grand Juries II and III, as well as to see whether

what Stans plead to was materially different from technical violations alleged against McGovern and other Democratic funding sources.

71. <u>The Milk Producers Case</u>:  The only substantive prosecutions for campaign finance violations involved the milk producers—who, it appears, made far more contributions to Democrats.  Several prosecutions resulted, but it would be interesting to contrast how much was uncovered with how much was actually presented to Grand Juries II and III.

72. <u>Prosecution of Dwayne Andreas</u>:  Dwayne Andreas was CEO of Archer-Daniels-Midland, a huge agribusiness conglomerate.  He also had been the sole trustee to the blind trust Hubert Humphrey had established as Vice President, as well as finance chairman for Humphrey's 1968 campaign against Nixon.  When Andreas' pre-April 7, 1972 contribution to Nixon's re-election campaign became known as a result of the Watergate scandal, he quickly became a tempting target for betrayed Democrats.  He was indicted, but acquitted, for campaign finance violations.  It would be interesting to track this rather unique investigation and prosecution through its grand jury investigations— and the discussions preceding his indictment.

73. <u>Other WSPF Investigations</u>:  Similar questions can be raised regarding the work of the other two WSPF task forces--political dirty tricks and ITT—in connection with Grand Juries II and III.  Was there abuse of witnesses?  Were there selective prosecutions?  Were the grand juries informed of the partisan nature of the investigations?

## CONGRESSIONAL INVESTIGATIONS

74. <u>Impact of Congressional Investigations</u>:  Investigations by the Ervin Committee and the House Judiciary Impeachment Inquiry focused on abuses of power and political dirty tricks, as well as on the criminalities of the Watergate break-in and its subsequent cover-

up. Unlike WSPF investigations, where some semblance of grand jury secrecy was observed, the Congressional hearings were public from the outset—and devastatingly effective in bringing a premature end to Nixon's presidency. There are a series of individual concerns discussed below, but the overall issue is the proximity of disclosures from these investigations with those from the Church Committee that began less than a year later.

75. Assumption of Kennedy Investigation: Senator Kennedy began his own Watergate investigation in October, 1972, when the first break-in indictments did not include anyone above Liddy and McCord. Indeed, the Ervin Committee was created because it was felt that Kennedy's investigation had too many political overtones—but his records and his chief investigator, Carmine Bellino, were subsumed into the Ervin Committee. Full disclosure might well show how much of the later investigation was directed by Senator Kennedy or his staff and the extent to which it was built on Kennedy's initiative.

76. Butterfield's Taping Disclosure: While Alexander Butterfield first disclosed the existence of the White House taping system, supposedly in response to a parting question from a Republican staff members, he also claimed that Committee staff had shown him a partial tape transcript and asked him how it was obtained. It would be interesting to see if the Committee's records reveal precisely how this information came into their possession and how they went about pursuing the idea of a taping system.

77. Dash's Coordination of Questions by Committee Members: In an interview years later with Warren Leary of the *New York Times*, published on May 30, 2004, the Ervin Committee's chief counsel, Sam Dash, stated that he had carefully scripted the hearings and had supplied questions to each Senator to avoid duplication and develop new

material.  It would be interesting to see how these questions were produced and distributed—and whether any were supplied by WSPF prosecutors.

78. <u>Coordination Between WSPF and Congressional Investigations</u>:  No record appears to have survived in WSPF files to indicate any actual coordination of their investigations with those of the Congress, but it is clear there was a good deal of staff interaction—from the WSPF obtaining nightly hearing transcripts on the one hand to Ervin Committee staff obtaining access to FBI investigatory materials on the other.  Is it possible that WSPF prosecutors, having already had access to their grand jury testimony, fed suggested questions to the Ervin Committee for use at their hearings?  What is clear is that the charges of perjury brought in the cover-up trial all seem to be drawn from Ervin Committee testimony.  There also remained the issue of how to understand and interpret the "Roadmap" prepared by WSPF and funneled through Grand Jury 1 to the House Judiciary Committee.  It would be interesting to review the Ervin Committee and House Judiciary Committee records to see if they disclose the specifics of any actual communication and coordination WSPF prosecutors.

79. <u>CIA Stiffing of Investigations</u>:  The WSPF Report dated October, 1975 and Fred Thompson, the Ervin Committee's minority counsel—in his book, *At That Point in Time, the Inside Story of the Senate Watergate Committee* (1975)—both lament how little cooperation they received from the CIA in the course of their investigations.  Indeed, Jim Hougan, in *Secret Agenda:  Watergate, Deep Throat and the CIA* (1984) suggests extensive CIA involvement in Watergate from the very outset.  It would be interesting to see how hard each tried to uncover its full involvement—especially in light of later

Church Committee disclosure of extensive CIA domestic spying activities within the United States for the preceding decades.

80. <u>Forthcoming Nature of FBI Testimony</u>:  Along those same lines, Senator Baker, who served on both the Ervin and Church Committees, seems to wonder during the testimony of FBI agents Courtney Evans and Cartha DeLoach just how their responses before the Church Committee seemed to differ from his recollection of their responses to similar questions during the Ervin Committee's investigations.

81. <u>Dash Influence on Dean Testimony</u>:  In his book, *Chief Counsel:  Inside the Ervin Committee* (1976), Sam Dash details a series of meetings with John Dean and his defense counsel that began at the counsel's office in and were later held at Dean's home in Alexandria, Virginia—and suggests he had more than a little involvement in helping prepare Dean's 245 page opening statement.  It would be interesting to see if more information about this close cooperation and coordination is available from Ervin Committee records.

82. <u>Dash Preparation of Dean Question</u>:  One of the great misnomers about Watergate is the idea that Dean was the first to accuse President Nixon of direct involvement in the Watergate cover-up.  Indeed, press speculation regarding his upcoming testimony clearly contained this prediction.  Dean's testimony itself, however, did not make any such accusation.  The closest he came was in careful response to a question posed by Chief Counsel Sam Dash, which is detailed in Chapter 9 of my book.  It would be interesting to review any Ervin Committee records that cast light on the preparation and coordination of this question and oof Dean's response.

83. <u>Ervin Committee Granting of Dean Immunity</u>:   The public record is quite confusing as to

precisely how and when Dean received a commitment on immunity from the Ervin

Committee.  The November 15, 1973 Denny/Rient memo has the career prosecutors

recalling that competition from the Ervin Committee began to affect Dean's cooperation

with them around mid-April, 1973—but books by Dash and Dean, along with those by

Senators Ervin and Weicker (the maverick Republican whose vote was necessary for any

such immunity grant), suggest that personal interactions did not actually occur until after

Dean had left his position as Nixon's counsel (April 30th).  It would be interesting to see

if Ervin Committee records shed any light on early communications with Dean or his

defense counsel.

84. <u>House Judiciary Impeachment Inquiry</u>:   Troublesome questions regarding the integrity of

the Impeachment Inquiry staff were first raised by Jerry Zeifman in his book, *Without*

*Honor, the Crimes of Camelot and the Impeachment of President Nixon* (1995).  Among

other things, he suggests the staff, including its Director, John Doar, operated under the

direction and control of Doar's former boss at the Department of Justice, Burke Marshall,

who was teaching at Yale Law School, but who kept in close touch with and expected to

be appointed Attorney General should Senator Edward Kennedy be elected President.

Zeifman says only a handful of young staffers, predominantly recent Yale graduates

dispatched by Marshall (including Hilary Rodham and Renata Adler), knew their real

purpose was to slow down the Nixon impeachment to assist Democratic chances in the

1976 election.  The real challenge was to keep the rest of the staff doing busy work for

some six months, while pressures built for Nixon's ultimate removal.  Zeifman also says

a study of allegations of abuses of power by earlier presidents that had been

commissioned by the staff and prepared under the direction of C. Vann Woodward of

Yale University was suppressed when its portrayal of earlier allegations made those being

made against President Nixon seem less onerous in comparison.  The Vann Woodward

study was indeed published shortly after Nixon's resignation—and Zeifman's allegations

also garner partial support from Renata Adler's essay, appearing in the December, 1976

issue of *Atlantic Monthly*, which, among other things, suggests that most of the

committee staff had little idea of what was really going on.  It would be interesting to see

whether committee records support these and other Zeifman accusations.

85. Committee Handling of "Roadmap":  The Impeachment Inquiry staff's handling of the

"Roadmap" raises all sorts of questions.  Was it, in fact, utilized—or merely used as a

ploy to absorb staff time—as one writer has alleged?  As importantly, was there any overt

cooperation and coordination between WSPF prosecutors and Impeachment Inquiry

staff?

86. Church Committee Disclosures:  Book II of the Church Committee Final Report, *The*

*Growth of Domestic Intelligence: 1936 to 1976,* and its related hearings, document FBI,

CIA and military intelligence involvement massive abuses of power, as well as in

political activity, beginning in 1936—that substantially exceeded Nixon administration

initiatives.  Book II is available electronically at:

http://webcache.googleusercontent.com/search?q=cache:t5TzcMxroVgJ:www.icdc.com/~paulw
olf/cointelpro/churchfinalreportIIb.htm+%22Ideological+Organizations+Audit+Project%22&cd=6
&hl=en&ct=clnk&gl=us

87. One has only to read it and to peruse its 681 footnotes to appreciate that far more had

been going on before Nixon's election that met the eye.  But what is truly alarming is the

proximity of the Church Committee disclosures—beginning as they did, within a year of

Nixon's resignation.

88. <u>Extent of Knowledge of Prior Governmental Conduct</u>:  The scope and magnitude of these

prior illicit activities had to have been known by hundreds of individuals, including many

of those from the Kennedy and Johnson administrations who had so recently participated

in the finger-pointing of the Senate Ervin Committee and the House Judiciary

Impeachment Inquiry that so pilloried President Nixon and members of his

administration.  Yet nothing was said or done at the time.  Perhaps as surprising, no

academics or historians have seen fit to explore the troubling implications of this blatant

hypocrisy.  It is only Renata Adler ,a member of Impeachment Inquiry staff, writing in

the December, 1976, issue of *Atlantic Monthly*, who once observed:

> [I]n light of the Church Committee report and other documents, what remains of
>
> the records of the impeachment inquiry would support not only a claim that
>
> Richard Nixon was hounded from office after all, but also, more strangely, the
>
> reverse:  that the impeachment inquiry itself was just another phase in the
>
> continuation of the cover-up [of governmental abuses of power by prior
>
> administrations].

89. "<u>Classification" of Church Committee Investigation</u>:  While the hounding of Richard

Nixon has continued unabated, the documentation behind the Church Committee

Reports—apparently even that cited in the footnotes to Book II--remains permanently

under wraps, supposedly kept in a classified vault over which NARA has no control

because of its national security implications.  Perhaps some of the Committee's

investigations do remain sensitive—but certainly not those disclosed in Book II, which

deals solely with domestic intelligence activities.  It is almost as though Pandora's Box has been re-sealed—and these disclosures can be deemed never to have occurred.  There have been no books about the Church Committee or the importance of its disclosures— and certainly no cross-references to their impact on the Watergate scandal.  Even Wikipedia's summation of the Committee's work is so sparse as to be almost non-existent.

90. Parallels to Watergate Abuses of Power:  Whether responding to Nazi and Fascist influences, to worries about Communist infiltrations or Civil Rights agitators, or to riots and opponents of the Vietnam War, our government appears to have made plans and undertaken initiatives which we should very much view with alarm.  Yet, only Richard Nixon was called to account for these thousands of instances of domestic spying—and apparently by the very same people who had perpetrated or condoned them when done in earlier administrations.  For every abuse for which Nixon and his staff have been disgraced, there are clear parallels to abuses of prior administrations, all fully documented in evidence compiled by the Church Committee.  It is only through full disclosure of relevant materials can that these parallels can finally become known and better appreciated.

### JUDICIAL BRANCH CONCERNS:

### HANDLING THE WATERGATE APPEALS

91. Trial Conduct by Judges Sirica and Gesell:  Concerns regarding the conduct of the break-in, cover-up and Plumbers trials by Judges Sirica and Gesell already have been detailed in earlier sections.  What remains for review is how these concerns were treated on the many appeals that followed.

92. <u>Composition of the DC Circuit Court</u>:  Democratic appointees to the DC Circuit Court of
Appeals had remained in control since the Depression.  Eisenhower had made only three
appointments during his two terms as President, none of whom remained on the Court
after 1969, when Warren Burger was elevated to the Supreme Court, and Nixon had
made only three since assuming office in 1969.  As a result, the Circuit Court remained in
the hands of Chief Judge David Bazelon and a solid liberal block of four other judges:  J.
Skelly Wright, Carl McGowan, Howard Levanthal, and Spotswood Robinson.  A fifth,
Edward Tamm, had been deputy director of the FBI for over a decade and was a far more
conservative Democrat.

93. <u>Possible Resentment and Bias</u>:  Because at the time the District of Columbia did not have
its own criminal courts, those trials were conducted exclusively before federal judges of
the DC District Court.  As a consequence—and uniquely among all Circuit Courts of
Appeal--the DC Circuit had original appellate jurisdiction over an abundance of criminal
matters--that would have been heard in state courts everywhere else in America.  It was
the liberal block of the DC Circuit that had been feeding aggressively-decided cases--
finding new rights for criminal defendants--to the Supreme Court presided over by Chief
Justice Earl Warren that had become such a telling issue for candidate Nixon in the 1968
campaign.  His disdain for liberal judges certainly included those in control of the DC
Circuit Court—and they very much knew it.  Indeed, among the very first legislative
accomplishments of the Nixon administration was a bill giving the District of Columbia
its own set of criminal trial and appellate courts—to be filled by Nixon appointees—
thereby preventing the DC Circuit Court from discovering any additional rights for
criminal defendants.  The judges comprising this long-standing and well-known liberal

block would be less than human if they did not well remember how Nixon had made their decisions into a campaign issue and how the Nixon administration had removed their criminal jurisdiction when the Watergate cases came before them on appeal.

94. The Sirica Challenge: "Maximum John" Sirica was said to have been the most reversed judge in the DC District Courts before the Watergate trials, largely as a result of the conflict between his attitudes toward criminal defendants and those of the liberal block on the Circuit Court. In addition, however, his conduct of both the break-in and cover-up trials had been truly bizarre: cross-examining witnesses from the Bench, admonishing defendants in the jury's presence, and imposing unduly harsh sentences that were unprecedented in the federal courts. Actions that Judge Wright is said to have characterized as outstanding examples of an activist judge. How is it, one might wonder, that the most-reversed Judge Sirica in all other criminal trials somehow became the darling of the liberals and the one who was uniformly upheld on all thirteen appeals from his Watergate trials?

95. The Statistical Probability: With the block of five liberal members poised against three Nixon appointees and a conservative Democrat, there was substantial statistical chance that the normal and random assignment of three judges for any given appeal might result in a two-to-one ruling finding that Sirica had not provided the Watergate defendants with the rudiments of due process. In a criminal system that had long emphasized technical rules of evidence, near-perfect trial conduct, and glorified in the observations that it was better to let a hundred of the guilty go free than to convict one innocent individual, one can only imagine the concern if, by fluke, a Watergate defendant's conviction had been reversed and remanded.

96. <u>Stacking the Deck on Appeal</u>:  These same concerns troubled Archibald Cox, who
    already had unsuccessfully tried to stop the Ervin Committee's public hearings which he
    feared were generating so much adverse publicity that it was in danger of poisoning the
    DC jury pool.  And it was that DC jury pool, with its hugely Democratic leanings, from
    which the most favorable (anti-Nixon) juries were to be drawn.  Cox came up with an
    ideal solution, which he pitched to Judge Bazelon in a highly improper *ex parte* meeting:
    if all appeals were to be heard by the entire court from the outset, the liberal block could
    assert its numerical superiority to prevent any possibility of reversal.

97. <u>100% *Sua Sponte En Banc*</u>:  Bazelon apparently took Cox's idea to heart and engineered
    a change in the court's procedures.  It is a unique and startling fact that each and every
    appeal from Judge Sirica's Watergate-related rulings was upheld—and each and every
    appeal was heard *sua sponte en banc*:  by all nine appellate court judges participating in
    hearing the appeal from the very outset, rather than from a re-hearing of the full court
    following a decision by a more traditional hearing before three appellate judges.  Perhaps
    the most comprehensive discussion of the history and development of the *en banc*
    procedure can be found in a law review article by Douglas Ginsburg, then a DC appellate
    court judge, and his former clerk, Donald Falk:  *The Court En Banc*, <u>The George
    Washington Law Review</u>, June, 1991, Vol. 59, No. 5.  Judge Ginsburg's article points out
    that only about one percent of all Federal appeals are heard *en banc*, but notes that the
    DC Circuit has a far greater proportion of *en banc* re-hearings due to its heavier caseload
    of regulatory appeals.  But even as Ginsburg's article notes the uniqueness of a collection
    of appeals being heard *en banc*, it fails to note or comment on the fact that all of the
    Sirica appeals were heard *en banc* from the very outset, *sua sponte*—thus avoiding any

difficulty of the DC Circuit's liberal block having to possibly overturn a three judge reversal due to Judge Sirica's prejudicial trial antics. How all of this came about is certainly deserving of further review—not just of how Judge Bazelon orchestrated the initial case, but of how the unique procedure was continued in effect—and whether any of the other judges ever questioned it—or the origin of the idea for that approach.

98. *Per Curium* Opinions: Of the thirteen appeals from Watergate-related rulings by Judge Sirica, seven were issued either per curium or without any opinion at all. It would be most interesting to see how these decisions were arrived at—and who actually drafted the opinions as issued.

99. Decision Without Hearing: One appeal was decided without even giving the defendants an opportunity to be heard at oral argument: Mitchell v Sirica, 502 F2d 375 (1974) was the application for a Writ of Mandamus disqualifying Judge Sirica from presiding over the cover-up trial, possibly the last clear chance for the defendants to get a fair trial, if one could be had at all, within the District of Columbia. The decision, unsigned and issued without comment on June 7, 1974, was accomplished without the opportunity for an actual hearing. A dissent was filed a month later by Judge MacKinnon, which is worthy of review.

100. Bazelon Recusal: While all of the above anomalies call out for thorough review of any internal records of the DC Circuit Court, there remains yet another mystery: From all outward appearances, Chief Judge Bazelon withdrew from opinion writing shortly after issuance of the last Watergate-related appeal at the end of 1976. He authored virtually no opinions after that and his public appearances dropped off to almost zero— even as he remained as Chief Judge until 1978, and senior judge until his death in 1993.

One cause was certainly his Parkinson's disease, but one wonders if burden of knowing how the deck had been stacked for hearing all the Sirica appeals also weighed heavily upon his conscience. There is nothing to reflect this in any of the personal papers he left to the Law School of the University of Pennsylvania, which were sealed until his death, so the only remaining source are his internal court records—and those of other members of the liberal block.

101.     The Supreme Court Case:  The sole Watergate-related case granted *certiorari* by the by the US Supreme Court was *US v Nixon*, 418 US 683 (1974), which upheld the WSPF's request for a subpoena *duces tecum* for tape recordings of some sixty-four Watergate-related conversations involving President Nixon. The 8 – 0 holding of the court (with Justice Rehnquist not participating) is generally cited for the proposition that presidential claims of executive privilege are insufficient to withhold evidence in a criminal trial, but at least two issues remain of ongoing concern. (i) the issue of the standing of a lesser officer of the Executive Branch to maintain an action against an Article II officer and (ii) the propriety of the basis of a subpoena *duces tecum* in the specific facts of the Watergate scandal. Access to internal records of the Supreme Court might well help in resolution of these two issues.

102.     The Standing Issue:  A good deal of the brief and the reply brief filed on behalf of President Nixon revolved around whether the Special Prosecutor had the requisite standing to maintain the action at hand. The sensitivity of the issue is perhaps best described in a speech entitled "*On the Twenty-fifth Anniversary of the Saturday Night Massacre*" delivered by Judge Silberman of the DC Circuit Court to the University of Minnesota Law Review Symposium in Minneapolis on October 24, 1998:

As I am sure this distinguished gathering realizes, the most important legal issue

in the famous case, Nixon v United States, was not the matter which gained all the

attention.  Indeed, it was virtually swept under the rug in the Supreme Court's

decision.  That question, of course, was a jurisdictional one—the tenuous claim to

Article III standing that a special prosecutor in the Justice Department asserted in

suing his constitutional superior.  When the President raised the point in his brief

to the Supreme Court, Leon Jaworski—obviously worried—wrote to the Attorney

General claiming that the President was, by that tactic, violating the charter.

Jaworski's argument was that for the President to challenge the court's

jurisdiction to adjudicate the tape case was, in effect, to threaten to put Jaworski

out of business.

Jaworski asked us to intervene [Silberman being Deputy Attorney General at the

time].  I suppose you would not be surprised—given my well-known views on

jurisdiction—that I was quite unsympathetic to Jaworski.  After all, it is normally

thought that a party, and particularly the government, has an obligation to raise a

legitimate question as to a federal court's jurisdiction.  There was no doubt that

the issue was legitimate.  I actually believed then, and still do, that the court

lacked jurisdiction.  The notion that the Special Prosecutor's charter—an Attorney

General's regulation—was sufficient to give the Special Prosecutor constitutional

independence from the President seemed almost frivolous to me.  In any event,

we rebuffed Jaworski and stayed neutral, but as it turned out, his fears were

groundless.  The Supreme Court was not about to permit mere constitutional

limits on judicial power to prevent it from playing the dominant role to which had

grown accustomed.

103.     Indeed, the Court's opinion does not appear to address this issue directly.  Instead,

simply dismissing the standing issue in a conclusory sentence at the end of a substantial

discussion of justiciability:

> It would be inconsistent with the applicable law and regulation, and the unique facts
>
> of this case to conclude other than that the Special Prosecutor has standing to bring
>
> this action and that a justiciable controversy is presented for decision.

It would be interesting to see what real consideration, if any, preceded this published

opinion of the Court.

104.     Basis for Subpoena *Duces Tecum*:  The brief filed on behalf of President Nixon

challenged the basis for the Special Prosecutor's subpoena duces tecum under Rule 17(c)

of the Federal Rules of Criminal Procedure, asserting that the Special Prosecutor had not

produced sufficient justification for each of the 64 requested tapes—quoting from the

Prosecutor's May 10, 1974 memorandum which stated "each of these materials *contains*

*or is likely to contain* evidence that will be relevant to the trial of this case" and later that

"*In all probability*, many of the subpoenaed items will contain evidence which will be

relevant and material to the trial. . . "[Italics in original brief]. The sensitivity occurs

because of considerable case law emphasizing that in criminal cases such a subpoena

must meet the very strict requirements set forth by Judge Weinfeld in *US v Iozia* 13 F. R.

D. 335 (SDNY, 1952), which included that the documents be evidentiary and relevant,

and that the application be made in good faith and not be intended as a general fishing

expedition.  Yet one is left with the clear impression that the subpoena was really

designed to uncover as much adverse information as possible regarding President Nixon himself.

Yet this goes virtually undiscussed.  The Supreme Court, in upholding the subpoena, observed:

> Our conclusion is based on the record before us, *much of which is under seal.*
>
> [Italics added]

Release of the materials on which the Court based its decision may well show whether WSPF prosecutors were acting in good faith in the issuance of that subpoena (rather than being on a fishing expedition), as well as allowing a review to see if material from any of the requested 64 tapes thus produced was ever, in fact, used by the WSPF in its prosecution of the cover-up case.

## PRESIDENT NIXON'S GRAND JURY TESTIMONY

105.     If, after review of all the materials and issues set forth above—virtually all of which preceded the taking of President Nixon's grand jury testimony on June 23-24, 1975—this Honorable Court is persuaded to order their release, then and only then might it be appropriate to release the President's own testimony.

Pursuant to 28 U.S.C. § 1746, I declare under penalty of perjury that the foregoing is true and correct to the best of my knowledge and belief.

.

Executed on January 17, 2011

Geoff Shepard