IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

)
IN RE PETITION OF GEOFFREY SHEPARD ) Misc. No. 11-0044 (BAH)
)

# MOTION TO NARROW REQUEST FOR UNSEALING

Government counsel has requested Petitioner to consider narrowing the scope of his request to unseal certain grand jury documents, in addition to the Road Map itself. Herein is his suggestion for this Honorable Court.

BACKGROUND

The Road Map is the centerpiece of the effort by Watergate prosecutors to reach Richard Nixon "at all cost", the characterization used by Special Prosecutor Leon Jaworski in his January 21, 1974 memo complaining about the lack of objectivity within his staff.[1] They had convinced themselves that they had uncovered evidence that President Nixon had personally directed payment of Howard Hunt's monetary demands – and were eager to get that information to the House Judiciary Committee, so it could form the basis for Nixon's impeachment.

While unsealing the Road Map itself is important, even more crucial to appreciating the prosecutor's devastating initiative, are any transcripts of what they told Watergate grand jurors during January and February of 1974.

---

[1] "Now let me address myself to the general tenor of your memorandum which reflects an attitude I discussed with you before – the subjective conviction that the President must be reached at all cost".

1

After all, the grand jury was not leading the investigation, Watergate prosecutors were. The central issue is this: "What did the prosecutors say that convinced grand jurors both (i) to name Richard Nixon as an unindicted co-conspirator in the Watergate cover-up and (ii) to adopt the prosecutor-drafted Road Map as their own?"

The critical portion of the Road Map is how it treats the events of March 21 and 22, 1973. This begins with John Dean's meeting with President Nixon from 10:12 to 11:55am on the morning of Wednesday, March 21st. Known as Dean's "cancer on the presidency" speech, Dean, for the first time, detailed some specifics of the ongoing cover-up – and revealed that Howard Hunt was threatening to disclose some of the "seamy things" he had done for the Nixon White House if his monetary demands were not met (particularly the break-in into the offices of Dr. Louis Fielding, Daniel Ellsberg's psychiatrist).

While Nixon did toy with the idea of meeting Hunt's demands, it was only in the context of buying time to get out ahead of Hunt's threatened disclosures. It is clear from the White House tapes that the Dean meeting ended with nothing more than the decision to invite John Mitchell down from New York to assist in working out a solution. Nixon's circle of advisors met again later that afternoon, from 5:20 to 6:01pm, and again with Michell the following day, from 1:57 to 4:43p – so there are at least two more critical tape recordings which are already in the public domain.

Most significantly, these recordings show that Nixon had decided that the proper course would be for the White House itself to initiate the disclosures which Hunt was threatening – and the way to do that was for him to announce that new information had come to his attention, that as a

2

result he was calling for a renewed investigation, and that members of his staff would be made available to testify without claim of executive privilege. It was agreed at the meeting on March 22nd that Nixon would use as the basis for such action a report that John Dean had agreed to prepare.

This was a positive and quite proper response, but never came to fruition. Since he had been running the cover-up, apparently without informing Nixon or his senior staff of any specifics regarding his own criminal activities (in addition to obstruction of justice). These included subornation of Magruder's perjured grand jury testimony, destruction of evidence removed from Hunt's office safe, improper sharing of prosecutorial information with counsel for the Watergate burglars, and embezzlement of $4,000 of campaign funds to pay for his planned honeymoon. Dean quickly realized that any report he could prepare would constitute a confession of his own guilt. So instead, he retained criminal defense counsel and sought out Department of Justice prosecutors in pursuit of personal immunity.

But something else occurred that same Wednesday evening, which triggered the prosecutors' fondest hopes: the final "hush money" payment was made to Hunt's lawyer at approximately 10 pm that very night. Entirely on their own (that is, without benefit of testimony from any witness – then or in the decades since), Watergate prosecutors concluded that Nixon must have ordered that payment to be made. While this conclusion turned out to be in error (confirmed by the sworn testimony of the government's own witnesses), it is little wonder the Watergate Special Prosecution Force became so antagonistic toward Richard Nixon and so determined to provide

the House Judiciary Committee with what they had concluded was clear evidence of his personal wrongdoing.[2]

Petitioner readily concedes that it is not vital to his case for the entire Road Map to be unsealed. While he would like to see the full version, his real focus is on only two things:
- The Road Map section(s) that address events of March 21 and 22, 1973, and
- Revelation of whether the Road Map's accompanying materials included copies of any White House tapes (particularly of meetings occurring in the above referenced time frame).

In addition, and most importantly, Petitioner seeks the unsealing of transcripts of any statements made by prosecutors to the grand jurors with regard to President Nixon or to these particular meetings. These transcripts of prosecutorial assertions, if they exist, would have been made during January and February of 1974, and would particularly include statements made on February 25th, the date it is said that Leon Jaworski asked the grand jury to name Nixon as a co-conspirator. *NB: Petitioner does not seek the unsealing of any actual witness testimony before the grand jury, he seeks only the unsealing of prosecutorial representations made to the grand jurors with regard to the actions of President Nixon.*

ARGUMENT

---

[2] A detailed recitation of prosecutors' reactions can be found in Ben-Veniste, Richard and George Frampton, Jr. *Stonewall: The Real Story of the Watergate Prosecution.* Simon and Schuster (1977), Chapter 10, "Le Grand Fromage", pp. 211-254.

4

Petitioner would make an additional point: the issue is not only one of grand jury secrecy; it is also one of grand jury abuse. The Road Map was the product of a corrupt bargain between Watergate prosecutors and Chief Judge John Sirica, to wit: Prosecutors would bring the cover-up indictments in time for Sirica to name himself as trial judge, in exchange for his support of their plan to forward grand jury materials to the House Judiciary Committee.

The evidence of this is clear – and attached to this Motion:

- In a January 27, 1974 memo to Special Prosecutor Leon Jaworski, Philip Lacovara described a most creative approach to accomplish such transmittal, which would ordinarily be in flagrant violation of grand jury secrecy rules. As a part of the plan, he urged an *ex parte* approach to Judge Sirica, to give him advance notice of prosecutors' anticipated approach, which was sure to come before him for a ruling. [See Exhibit A.]
- Jaworski's memo to his confidential Watergate file dated February 12, 1974, described his *ex parte* meeting with Judge Sirica, wherein he detailed prosecutors' plan and listened again to Sirica's own urging that the indictments be returned in a timely manner, such that he could name himself to preside at that trial. *NB*: These apparently are the only two topics discussed at this particular *ex parte* meeting. [See Exhibit B.]
- Jaworski's memo to his confidential Watergate file of March 1st described his additional *ex parte* meetings with Judge Sirica on the morning of March 1st, where the two rehearsed how the prosecutors (i) would present the indictments in such a manner that Sirica could name himself to preside at trial, and (ii) would present the Road Map

5

and related materials for Sirica's transmittal to the House of Representatives.  [See Exhibit C]

Talk about a cover-up:  these revealing documents were kept secret for over four decades, as the top three Special Prosecutors each improperly took their sensitive Watergate files with them when they left office.  Jaworski's Watergate files did not surface until 2013, when discovered, recovered and subsequently made available by the National Archives in response to Petitioner's FOIA request.  Watergate files of Archibald Cox are kept in the Treasure Room of Harvard's law library, as are those of Associate Special Prosecutor James Vorenberg (whose key staff meeting notes only became available for review, in response to Petitioner's continued requests, in 2015).

There is further evidence of grand jury abuse in connection with Richard Nixon:

- The grand jury took a straw poll on whether to indict President Nixon and did so with Watergate Task Force deputy Richard Ben-Veniste in the room, at least according to the statement of grand juror George Gross.[3]
- Vorenberg's staff meeting notes contain records of the following: [4]
    - That Judge Sirica had approved the format of the proposed grand jury report (in what must have been another *ex parte* meeting with Jaworski).

---

[3] A Brian Lapping Associates Production for the Discovery Channel and BBC (1994), vol. 3, *The Fall of a President*.
[4] Reproduced and analyzed in Petitioner's website at: http://geoffshepard.com/wp-content/uploads/2015/06/Vorenberg-Notes-2-28-74.pdf

6

- o Jaworski's expressed surprise that, when he appeared before the grand jury on February 25th to recommend that it name Nixon as an indicted co-conspirator, he got only three questions.
- o Jaworski's report that he had urged Sirica not even to hold a hearing on whether to forward the Road Map to the House of Representatives.

It is little wonder the competing Petition to unseal the Road Map, which appears to be based on the hope that it would provide a clear precedent for transmittal of grand jury information concerning President Trump, seeks to unseal only the Road Map itself and none of the underlying rational for its creation or adoption by the Watergate grand jury.[5]

In that regard, it also seems clear that the Road Map's transmittal to the House cannot be a valid precedent for today, both because of the prosecutorial and judicial abuse described above, and for the reason that the White House itself did not contest the proposed transmittal, so there was no actual contest between the proper parties.[6]

CONCLUSION

Petitioner's issues and concerns go to the very heart of Watergate prosecutors' secret allegations against President Nixon. The President's White House defense team (of which Petitioner was a part) had no idea of their specificity – that Nixon must have personally ordered that Hunt's monetary demands be met. As importantly, that allegation happens to be completely untrue. Had Nixon's defenders known of the specific accusation,

---

[5] Petition of Benjamin Wittes, et al, 1:18 – mc – 00 (BAH)
[6] See Haldeman v Sirica, 501 F.2d 714 (D.C. Cir. 1974), cert. denied, 418 U.S. 955 (1974)

7

they could have refuted it. Had Nixon known, he would never have resigned – since he would have known it to be completely untrue.

But Nixon had already resigned by the time the cover-up trial commenced. While the prosecutors promised in their opening statement to show Nixon's personal involvement, their story came completely apart when their own witnesses, when under oath and subject to cross-examination, told an entirely different version (particularly Fred LaRue, who had been the "hush money" paymaster): Nixon simply did not and could not have directed the final payment to Hunt's counsel on the evening of March 21, 1974.

But the damage from the grand jury's naming Nixon as an unindicted co-conspirator and its adoption of the Roadmap as its own, as well as the outcome of the secret briefings of House Judiciary Committee chief counsel John Doar, had already done irreparable damage to Richard Nixon and to his presidency.

The fact remains that we may well have lost a President based on untrue representations, conveyed in total secrecy, to Watergate grand jurors and to the House Judiciary Committee staff. Unsealing relevant portions of grand jury transcripts will show whether this be true.

Surely this Court, and this Chief Judge in particular, has an interest (if not an obligation) to examine credible claims of prosecutorial and judicial misconduct, as well as of grand jury abuse. Evidence of which includes:

- Judge Sirica's series of *ex parte* meetings with Watergate prosecutors, including Archibald Cox, Leon Jaworski, Philip Lacovara, Henry Ruth, Earl Silbert and Richard Ben-Veniste, as well as his *ex parte* meetings

8

with other parties with interests that were adverse to President Nixon, including Samuel Dash (chief counsel to the Senate Ervin Committee), Clark Mollenhoff (Nixon's former special counsel), and Edward Bennett Williams (counsel both to the *Washington Post* and the Democratic National Committee).[7]

- Prosecutors failure to share clearly exculpatory evidence of the dramatically changes in testimony of its two principle witnesses (John Dean and Jeb Magruder) during the course of their meetings with the original DOJ prosecutors.[8]
- Judge Sirica's temporary sentencing of John Dean, shortly before trial, to a prison term of 1-4 years,[9] gleefully cited by prosecutors as substantially increasing his witness credibility,[10] only to reduce his sentence to "time served" on his own motion but a week after the cover-up convictions had been achieved. More recently, Dean has bragged that he had been put in a witness protection program and had never spent a single night in jail (while all of America, as well as the trial jury, was told quite a contrary story).
- Archibald Cox's own *ex parte* meeting with Chief Judge David Bazelon of the DC Circuit to urge stacking the deck on any appeals, to be sure that Sirica's pro-prosecution conduct did not lead to reversals on appeal.[11]

NARROWED MOTION TO UNSEAL

---

[7] Shepard, Geoff. *The Real Watergate Scandal, Collusion, Conspiracy, and the Plot that Brought Nixon Down* (Regnery, 2015), Chapter 4, "The Secret Meetings Between Judges and Watergate Prosecutors", pp.49-66.
[8] *Ibid.* Chapter7, "Evenhanded, Nonpartisan Prosecutors", pp. 163-180.
[9] *Ibid.* Chapter 6, "A Fair and Impartial Trial Judge", pp. 128-139.
[10] Ben-Veniste, *Op. Cit.* p. 107.
[11] Shepard, *Op. Cit.* Chapter 8, "The Automatic Right to an Appeal", pp. 202-227.

Petitioner would prefer that the remainder of the full Road Map and transcripts of any related prosecutorial representations made to the Watergate grand jury during January and February of 1974 be unsealed.

As an initial step, however, he would offer the following:

- NARA confirmation that materials transmitted to the House that accompanied the Road Map included copies of White House tapes. This is significant because it is settled law, due to the Separation of Powers structure of our Constitution, that Congress cannot require the Executive to produce anything against its will. They have the power to impeach, of course, but not the power to require disclosure.[12] Forced transmission of copies of White House tapes would not only violate grand jury secrecy rules, but also seem to be unconstitutional as a matter of law. If it becomes clear that copies of White House tapes were not transmitted, then Petitioner will withdraw that portion of his motion to unseal.
- *In Camera* review by this Court of any transcripts of prosecutorial representations during January and February of 1974 that accuse President Nixon of having personally directed payment of Howard Hunt's monetary demands. The paper trail leading up to the grand jury door suggests this was their intent, but either they did or they did not make such representations. If they did not, or there is no grand jury transcript of what was represented, then Petitioner will withdraw

---

[12] President Nixon voluntarily submitted <u>transcripts</u> of some 48 conversations to the House Judiciary Committee on April 30, 1974 and said he would allow the chairman and ranking member to listen to the actual tapes, in order to confirm the accuracy of these transcripts, if they so choose. Yet on June 25th, the Committee published its own transcriptions of the same eight conversations originally turned over in the fall of 1973, in response to a Watergate grand jury subpoena issued on July 23rd. One wonders how the Committee obtained these tapes if not transmitted as a part of the Road Map.

10

that portion of his motion to unseal. If they did, as Petitioner has every reason to believe, then it would be appropriate to explore what portions might be proper to unseal.

Dated: November 5, 2018

Respectfully submitted,

  /s/ Geoffrey C. Shepard
GEOFFREY C. SHEPARD
[Note New Mailing Address]
535 Gradyville Road, Unit 118S
Newtown Square, PA 19073
Tel: 610-389-5779
Email: geoff@geoffshepard.com

Attachments

## CERTIFICATE OF SERVICE

I hereby certify that on this date, I caused a copy of the foregoing motion to be sent through electronic mail, to the following:

ELIZABETH J. SHAPIRO
United States Department of Justice
1100 L Street, NW, Room 12100
Washington, D.C. 20530
Tel: (202) 514-5302
Fax: (202) 616-8460
elizabeth.shapiro@usdoj.gov, Attorney for the United States

Dated: November 5, 2018

  /s/ Geoffrey C. Shepard
Geoffrey C. Shepard

11

WATERGATE SPECIAL PROSECUTION FORCE     DEPARTMENT OF JUSTICE

# Memorandum

TO : Leon Jaworski
Special Prosecutor

DATE: January 21, 1974

FROM : Philip A. Lacovara
Counsel to the Special
Prosecutor

SUBJECT: Presentment by Watergate Grand Jury Concerning the President

    As part of our consideration of the most appropriate way of dealing with evidence tending to implicate the President in the Watergate cover-up, we have discussed the possibility of advising the grand jury that it may return a presentment setting forth its views of the President's complicity even though it might be determined as a matter of law or policy that the President should not be indicted. Peter Kreindler was asked to prepare a memorandum on this subject and he has reached the conclusion, reflected in the attached memorandum, that submission of such a presentment by the grand jury would be constitutional. I have been discussing this subject with him since the beginning of his research and am familiar with the authorities. I agree with his analysis and conclusions in all respects.

    If you agree that presentment in lieu of either indictment or non-action is the proper mode to pursue, there remains the question of procedure. Specifically, the relative rarity with which presentments are filed in federal courts makes it desirable to advise Chief Judge Sirica in advance of this proposed course. It would be most unfortunate, for example, for the grand jury to return a presentment without forewarning and then have the judge summarily refuse to receive it because of his lack of awareness of the basis for such a submission. However, it is also questionable whether we should discuss this procedure with the chief judge before the grand jury, whose decision would be involved, has had an opportunity to consider this possible course. Yet there would be some risk in discussing such an approach with the grand jury, and perhaps planting a seed that could not be unsown, before the judge has at least tentatively indicated that he would be prepared to accept such a presentment.

- 2 -

In light of all of the foregoing factors, I recommend the following course:

1. That you decide formally and as quickly as possible what advice you want given to the grand jury in your capacity as its counsel on the questions of (a) the President's indictability as a matter of law, (b) the policy factors concerning indictment of an incumbent President, and (c) the propriety of the grand jury's submission of a presentment naming the President, either in open court or under seal, with a request that it be forwarded to the House Committee on the Judiciary. My own recommendation is that the grand jury be told (a) we believe that the President can constitutionally be indicted for the crime of obstruction of justice but that the question is subject to considerable doubt, and therefore (b), in light of the severe dislocations that would immediately flow from the naming of a sitting President as a criminal defendant, it would be preferable to leave formal proceedings to the House of Representatives. With regard to (c) the grand jury should be advised that it may return a presentment, which states its conclusions based on the evidence it has heard but which does not initiate a criminal proceeding, and I would propose that the presentment be submitted under seal to the chief judge, with a request that it be forwarded to the House Judiciary Committee after counsel for the President have been given an opportunity to submit any objections, either on the law or the facts, that they may have.

2. After you make the foregoing decisions, I recommend that you or I or both appear before the grand jury, at the conclusion of the presentation of the tapes, to advise them of these determinations. They should candidly be told that it is not certain how the court will respond to the submission of a presentment but should be advised that this matter will be discussed with the chief judge if the grand jury is inclined to return a presentment involving the President.

3. If the grand jury indicates its tendency toward returning a presentment, we should schedule a conference with Chief Judge Sirica to apprise him in advance of this possible development. I would be prepared to submit a memorandum of law to him at such a meeting, if he indicated an interest in receiving it.

- 3 -

    4.  At any such meeting we should recommend to Judge Sirica that the presentment be received by him under seal, with disclosure only of the fact that the grand jury has made a submission to him, and that the White House be given ten days to review the presentment and to make objections to its filing and transmission.

Attachment

cc: Mr. Ruth (w/attachment)
    Mr. Kreindler (w/o attachment)
    Mr. Ben-Veniste (w/o attachment)

EXHIBIT B

LJ/flc

February 12/1974

*For conf. Watergate file*

C O N F I D E N T I A L

On Monday, February 11, I met with the Judge at which time several matters were covered as we sat alone in the jury room. He again indicated that provided the indictments came down in time he would take the Watergate Case, stating that he had been urged to do so by any number of Judges from across the nation the most recent of them being those who were in attendance with him at a meeting in Atlanta. He expressed the opinion that these indictments should be returned as soon as possible. He also stated that henceforth all guilty pleas would be taken by him. We talked about the Vesco case and he merely expressed the thought that perhaps a sealed indictment might be of some help. He mentioned one or two personal matters such as an effort to smear him because of a completely fabricated tale relating to him and his son, of which he wanted me to be aware. Actually the discussion began with his unburdening himself to me on that particular matter. He also mentioned that he had been urged to speak at the State Bar of Texas in San Antonio and indicated that he would accept this invitation.

He sought my reaction and I urged him to do so.

The Judge commented upon the status of matters before the grand jury which led into further comments on the possibility of the grand jury considering some type of special report or presentment. He considered this a very touchy problem and cautioned as to what the public's reaction would be to a grand jury stepping out with something that was beyond its normal bounds. He cautioned that the whole effort could be tainted by something irresponsibly being done by the grand jury. He stated that the public would rightfully conclude that the entire proceeding had not been judicious but simply one of wanting to hurt the President. He further said that it was not the function of the grand jury but that of the House Impeachment Committee to express itself on that point. He then told me that in the event I observed anything along that line being considered by the grand jury that he thought it would be appropriate for him to meet with the grand jury <u>in camera</u>. I expressed the belief that it was appropriate for the grand jury to refer to having in its possession evidence that it believed to be material and relevant to the impeachment proceedings and to suggest to the Court that it be referred to the House Committee for that purpose. He countered by stating that he believed he should be informed of the discretion that he could exercise in matters of that kind and further requested that I have a memorandum prepared for him that covers this subject. I agreed to have this done.

On the eve of Thursday, February 28, with the Mitchell-Stans jury selected in New York and sequestered, it became apparent that we would move to bring in the Watergate cover-up indictments on Friday morning. After checking with Judge Sirica, the hour of 11:00 a.m. was decided upon. ~~I had previously talked to Judge Sirica about the bringing in of a sealed report by the grand jury, in addition to the indictment, and this had his support.~~ I made known to him in advance that such a report was forthcoming. ~~so as not to have him startled by this matter.~~

On Thursday evening, February 28, just as I was preparing to leave the office around 6:45, Alexander Haig called saying that there were so many rumors afloat that he was concerned - that he feared unexpected developments, etc. and he wondered if there was anything I could properly disclose. I told him that there was nothing I could disclose as to the contents of the indictment or the report he had heard would be made. I did tell him that if the grand jury made a report, in addition to returning an indictment, he should expect Judge Sirica, as would I, to accept it and act on it. He stated that he and the White House generally were fully expecting the grand jury evidence to be made available to the House Judiciary Committee - that they realized it belonged there. I suggested to him that the evidence may well have serious repercussions and he stated that he was aware of that. I suggested that he and the President's counsel take a close look at the March 21 meeting and the actions that followed, even though the President took no personal part in the events that followed the March 21 meeting.

Finally, he asked whether there was any indictment contemplated involving present White House aides, inasmuch as he needed to make arrangements to meet the situation. I told him none was contemplated at this time

Twice during the conversation, he said that he really called to tell me that I was a "great American." The second time he mentioned it, I said "Al, I haven't done anything other than what is my duty and I hope to continue to follow that course."

We parted with my again expressing my concern that the President's counsel had not sufficiently and accurately assessed the facts pertaining to the March 21 conference and the events that took place that night. He said it would be again reviewed.

On the morning of March 1, I met with Judge Sirica in chambers at 10:30. We reviewed the agenda consisting of (1) presentation of indictments and sealed special report of the grand jury; (2) unsealing of the special report and reading by Judge Sirica, and the acceptance of the report and its resealing. I told Judge Sirica that I would ask the Court to specially assign the case in view of its length and protracted nature and that I was estimating the case would take three to four months to try. I asked him to tell the grand jury to return in two weeks for further consideration of other matters that had not been disposed of. I had in mind the possibility of perjury indictments. I also asked the Judge for a gag order under Rule 1-27 restraining extra-judicial statements.

Shortly before 11:00, I left Judge Sirica's chambers and went into the courtroom. As I left Judge Sirica's chambers, I heard the Judge tell his marshal not to be nervous. But the Judge showed some signs of nervousness too. He told me that he had not slept since 3:00 that morning. When court opened, Judge Sirica's marshall was so nervous he could hardly speak the ritual followed in opening a court.

After opening, Judge Sirica looked at me, asked if I had anything to take up with the court. I then rose, went to the lectern, and said: "May it please Your Honor, the grand jury has an indictment to return. It also has a sealed report to deliver to the Court." The rest of the agenda was then followed including delivery of a briefcase of material, along with the special report to the Court - also a key to the briefcase. The Judge indicated that he would have an order on the special report by Monday (he told me he would transmit to the counsel for the House Judiciary Committee under rules that would not interfere with the trial of the accused). The Judge in open court asked if I had any further comments, and I stated: "Due to the length of the trial, conceivably three to four months, it is the Prosecution's view that under Rule 3-3(c), this case should be specially assigned, and we so recommend." This meant that Judge Sirica could assign the case to himself, which he did do by order later entered that day.

The Judge then announced his gag rule and then adjourned court.

We met in the Judge's chambers. I told him I thought all went smoothly. He in turn thanked me for my help. The Judge was

leaving today to speak at the University of Virginia tomorrow, to be back on Sunday. I told him I was going to Texas and that I would be back on Tuesday. We both agreed we would call each other in the interim, if necessary.