# IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

|  |  |  |
|---|---|---|
| IN RE PETITION OF GEOFFREY SHEPARD | ) ) ) | Misc. No. 11-0044 (BAH) |

## RESPONSE TO COURT'S ORDER OF AUGUST 13, 2019
## AND JOINT STATUS REPORT

In response to this Court's minute order of August 13, 2019, the government states the following:

**Government's Position**

1. On September 20, 2018, this case was reassigned from Judge Lamberth to this Court. On October 31, 2018, the Department of Justice notified the Court that the National Archive and Records Administration ("NARA") publicly posted a redacted copy of the Watergate Road Map, ensuring that all portions that it could locate in the public domain were unredacted and released. *See* Government's Status Report, ecf # 28. With respect to the small amount of redacted information, the Court had stayed this petition pending the D.C. Circuit's decision in *McKeever v. Sessions*, D.C. Cir. No. 17-5149, a case that presented the legal issue of whether district courts possessed inherent authority to disclose historically interesting grand jury information outside the confines of Criminal Rule 6(e). *See* Minute Order, Oct. 17, 2018. In that Minute Order, the Court ordered that, "[t]he parties shall, within ten (10) days of the D.C. Circuit's issuance of the mandate in *McKeever*, file a joint status report proposing a schedule to govern any further proceedings in this matter." *Id.*

2. The mandate in *McKeever* issued July 30, 2019, such that a joint status report in this matter was due August 9, 2019. Undersigned counsel sincerely apologizes for missing the deadline; the fault lies entirely with government counsel, and not with the *pro se* petitioner.

In a later-filed petition for the same materials, *i.e.*, the Watergate Road Map, the parties had entered into a stipulation of dismissal without prejudice. *See* Stipulation of Dismissal, *In Re Petition for Order Directing Release of the "Road Map" Transmitted by the Watergate Grand Jury to the House Judiciary Committee in 1974*, 18-mc-0125 (BAH), ecf # 16. The Court dismissed the action without prejudice the next day. *Id.*, Minute Order, April 16, 2019. Undersigned counsel mistakenly conflated this, still pending matter, with the dismissed petition, and failed to timely reach out to Mr. Shepard to solicit his views as to how the Court should proceed in light of the mandate issuing in *McKeever*.

3.     Undersigned counsel has now conferred with Mr. Shepard, and advised him of the government's view that this petition should be finally denied or dismissed. That result is required due to the D.C. Circuit's decision holding that courts lack inherent authority to release grand jury information for reasons other than those articulated in Criminal Rule 6(e)(3)(E)(i)-(v). Here, the Road Map has been released in its entirety save for a few Statements of Information that could not be found in the public domain. Government's Status Report, ecf # 28. In light of *McKeever*, there is no authority applicable to this petition pursuant to which the Court can order the disclosure of that remaining information. Moreover, even were the Court to accept petitioner's request to modify his request to seek a search for certain imagined, prosecutorial statements to the grand jury, there would still be no authority for either the Court or the government to rummage through grand jury transcripts in search of these supposed statements when, even if they existed, there would be no legal basis for their release. Accordingly, the pending petition should be denied, and this matter dismissed, without prejudice.

**Petitioner's Position**

1.     Mr. Shepard disagrees and believes a little background is in order to clarify his position.  He first became involved in response to the petition filed in this court by Stanley Kutler on September 8, 2010 (IN RE PETITION OF STANLEY KUTLER, ET AL, Misc. Action No. 10-mc-547 (RCL), seeking the release of Richard Nixon's grand jury testimony, which had been taken over three days, beginning on July 23, 1975.  Petitioner Shepard sought to intervene in that case in order to oppose its unsealing.  His position was two-fold:  First, the as sick and demoralized as Richard Nixon must have been at this point, he knew one thing for certain – and that was his testimony would remain sealed forever.  Second, that what was sauce for the goose should be sauce for the gander:  If Nixon's grand jury testimony was to be unsealed "for reasons of historic importance" than so also should be all of the other Watergate grand jury testimony.  To prevent the response that such a motion was not pending before the court in the Kutler petition, Shepard filed a separate petition seeking to unseal vast quantities of Watergate material, including (in addition to testimony from all three Watergate grand juries) internal documents of the Ervin Committee and the House Judiciary Committee's Impeachment Inquiry (both of which have been sealed for fifty years), as well as the internal documents of the Church Committee (which are likely to remain sealed forever).  Shepard also asked that his petition -- Misc. Action No. 11-mc-44 (rcl) – be consolidated with Kutler's, such that the unsealing of all Watergate materials be before the court at the same time and in a single case.  Then Chief Judge Lamberth disagreed:  He ruled against consolidation, but agreed to treat Shepard's petition as an *amicus* brief, and denied Shepard's expansive petition as overly broad, but gave him leave to resubmit a more limited request.

2.     Judge Lamberth then agreed with the Kutler petition and ordered the National

Archives to unseal Nixon's testimony – due to its historic interest.  For its part, the Department

of Justice chose not to appeal Lamberth's decision – a decision which is now totally

undermined by the Circuit Court's decision in the McKeever case.  And, yet, Nixon's grand

jury testimony was released to the public on November 10, 2011.

3.     Shepard's narrowed Petition, however, remained pending and it is that

Petition which is now before this Court.  Here is its justification:  Documents from the files of

the Watergate Special Prosecution Force, released by the National Archives in response to

Shepard's FOIA requests, suggest the special prosecutors informed Watergate grand jurors in

January or February, 1974, that they could show that Richard Nixon had *personally* directed

the payment of "hush money" to E. Howard Hunt and that he had done so on March 21, 1973,

shortly after learning of Hunt's demands from his counsel, John Dean.  In response to this

prosecutors' representation, the Watergate grand jury named Nixon an unindicted co-

conspirator in the Watergate cover-up case indictment, dated March 1, 1974.  The effect, when

this action became public, was devastating to the President and a major contributor to his

ultimate downfall.  What makes this so fascinating is that, when prosecutors sought to prove

this allegation during the course of the cover-up trial, with their witnesses under oath and

subject to cross-examination, their testimony showed instead how the prosecutors' accusation

of Nixon's personal wrongdoing, which had been made in secret to the grand jurors, could not

have occurred as described.  Since Nixon's defense team (of which Petitioner Shepard was a

part) never knew of the accusation in the first place, they had made no attempt to refute.  The

result is that the secret, but erroneous, accusation which destroyed the Nixon presidency simply

disappeared.  It has been Petitioner Shepard's goal for many years that this clear prosecutorial abuse be reviewed by this Court and become known to the American public.

4.      The sequence of these events is described in detail in Chapter 5 of Petitioner's book, T*he Real Watergate Scandal, Collusion, Conspiracy and the Plot that Brought Nixon Down* (Regnery, 2015), which is attached as Exhibit A for ease of reference.  The issue remains of interest even today:  Here is the link to Petitioner's recent essay on grand jury secrecy, which describes the judicial and prosecutorial abuses that led to the Road Map's transmittal to the House Judiciary Committee:  https://spectator.org/grand-jury-secrecy-and-jerry-nadler/.  In addition, here is a second link to Petitioner's essay on the special prosecutors' secret, but erroneous, allegations about President Nixon, which was published by *The American Spectator* this past Friday, August 9th, on the forty-fifth anniversary of President Nixon's resignation:  [https://spectator.org/troubling-watergate-revelations-too-late-to-matter/](https://spectator.org/troubling-watergate-revelations-too-late-to-matter/) .

5.      In sum, it is Petitioner's contention that the special prosecutors' secret, but erroneous, allegation that President Nixon had personally directed the "hush money" payment to Howard Hunt constitutes grand jury abuse on an epic scale.  Petitioner does not seek the release of any witness testimony before the Watergate grand jury.  Indeed, prosecutors could produce no witness who could testify to their contention.  Their case was, and remains today, entirely circumstantial.  In this sense, McKeever is not at all controlling.  This Court has the right – and the responsibility – to respond to credible allegations of grand jury abuse.  Thus, he seeks the unsealing of any representation by the special prosecutors concerning Richard Nixon made to grand jurors during January and February, 1974.  Petitioner believes, if such records exist, they will show a level of prosecutorial abuse, not only unprecedented in our history, but

perhaps actionable as a matter of law. It is the apparent prosecutorial abuse that is crucial to unseal.

6.  Petitioner makes three additional requests:

    a.  <u>Request for Hearing</u>:  Petitioner respectfully requests a hearing before this Honorable Court in order to have the opportunity to explain the background and basis for his Petition in greater detail – and to respond to any questions from the Bench.

    b.  <u>Review the Record in Camera before Deciding</u>:  Petitioner suggests that this Honorable Court review the applicable grand jury transcripts *in camera* before rendering any decision, in order to make an initial determination whether, in fact, such transcripts even exist and whether they constitute grand jury abuse.  Petitioner believes NARA officials could locate such transcripts with very little effort.

    c.  <u>Dismiss Without Prejudice, Rather than Deny</u>:  If the Court is inclined to deny Petitioner's request, he urges that it be handled in the same manner as the Benjamin Wittes Petition referenced above.


Dated:  August 14, 2019                                  Respectfully submitted,

                                                         JODY H. HUNT
                                                         Assistant Attorney General


                                                         ___ */s/ Elizabeth J. Shapiro*_____
                                                         ELIZABETH J. SHAPIRO
                                                         United States Department of Justice
                                                         1100 L Street, NW, Room 12100
                                                         Washington, D.C. 20530

Tel: (202) 514-5302
Fax: (202) 616-8460
elizabeth.shapiro@usdoj.gov
Attorneys for the United States

<u>**CERTIFICATE OF SERVICE**</u>

I hereby certify that on this date, I caused a copy of the foregoing Joint Status

Report to be sent through electronic mail, to the following:

**GEOFFREY C. SHEPARD**
535 Gradyville Road, Unit S-118
Newtown Square, PA 19073
Email: geoff@geoffshepard.com

Dated:  August 14, 2019

*/s/__Elizabeth J. Shapiro_____*
Elizabeth J. Shapiro

## Part III: Getting Nixon "At All Cost"

To fully appreciate the abuses of power that forced President Nixon to resign, it is helpful to separate the judicial and prosecutorial collusion aimed at getting the president out of office from the denials of due process that tainted the convictions of his senior aides in the Watergate trials, which are addressed in subsequent chapters.

## Chapter 5: Staffing the Nixon Impeachment

While internal WSPF documents show that from the very outset prosecutors dreamed of bringing Nixon into the criminal justice system, both Cox and Jaworski felt the proper venue for dealing with the president himself was the House of Representatives, in which the Constitution vests the power of impeachment. That said, Cox's own files contain an analysis prepared by a fellow professor shortly after Cox's appointment concluding that a sitting president can be indicted.[1] This same issue was briefed within the Department of Justice by both the U.S. attorney's office and the Office of Legal Counsel. In the month after Nixon had resigned but before he was pardoned, over a dozen individuals or groups of WSPF prosecutors submitted internal memos to Jaworski urging that the former president be indicted for his alleged Watergate crimes.

### A Backward Look at Nixon's Resignation

With the perspective of forty years, let's look again at how and why Nixon was forced to resign.

---

[1] Both Cox and his colleague James Vorenberg took their Watergate files when they left the special prosecutor's office. Those files are now located in the Harvard Law School library.

There is little question but that his resignation was triggered by his loss of all political support following the release on August 5, 1974, of the "smoking gun" tape of June 23, 1972—a tape, as we have seen, that everyone erroneously took as evidence of the president's obstruction of justice.

Knowing as we now do that the "smoking gun" conversation provided no grounds for impeachment, we can examine the other alleged wrongdoings that might have made it necessary for Nixon to resign. After all, the House Judiciary Committee had voted to recommend three articles of impeachment to the full House at the end of July, some two weeks before the smoking gun tape's public release. These articles were grounded in obstruction of justice, abuse of power, and failure to comply with a House subpoena. Let's review them in reverse order and see how they hold up today.

*Subpoenas for White House tapes*

The Judiciary Committee charged that Nixon's failure to comply with the House subpoena for the tapes was an unconstitutional act. Yet the president's position that he was not obliged to comply with the congressional subpoena because of the constitutional separation of powers was not extraordinary. Presidents as far back as Thomas Jefferson had declined to provide Congress with internal documents of the executive branch, and they had been consistently upheld by the courts. Indeed, both the House and the Senate had sued to obtain judicial enforcement of their subpoenas for the tapes, failing each time.

As a proposed accommodation, the White House had turned over to the Judiciary Committee on April 30, 1974, transcripts of some four dozen conversations, along with the offer that the chairman and ranking member could verify their correctness by listening to the tapes themselves.

The executive and legislative branches carry on this sort of tug of war almost every day. Most recently, the House has refused to turn over to the Securities and Exchange Commission

internal documents relating to an investigation of insider trading, and the Obama administration has declined many times to make documents available to House committee investigations. While the House does have the ultimate power of impeachment, that remedy is a "nuclear option" that is never used in practice. The Watergate scandal is the only occasion in history when the House Judiciary Committee has recommended impeachment of the president for refusing to comply with a congressional subpoena.

*Abuses of power*

Nixon's alleged abuses of power, which seemed outrageous at the time, pale in comparison with both past and current practices.

Beginning the year after Nixon's resignation, the Church Committee revealed a pattern of abuses in the name of national security stretching back to 1936.[2] During that period (and without court authority), the CIA opened at least 130,000 first-class letters to or from American citizens, the FBI conducted an annual average of 125 surreptitious entries ("black bag jobs") to plant bugs or to review personal files, and various military intelligence agencies routinely violated the privacy rights of American citizens. The Kennedy administration's Ideological Organization Audit Program triggered IRS audits of ten thousand donors to conservative charities. Robert Kennedy approved more wiretaps on Martin Luther King than Nixon, trying to plug leaks, had on his National Security Council staff. The FBI kept its own "enemies list" of some thirty thousand "subversives" to be rounded up in the event of widespread domestic unrest.

During the Obama administration, there have been disclosures of warrantless collection of data by the National Security Agency, as well as specifically targeted drone killings, with at least one American citizen among the targets. The White House has misled the American public

---

[2] See Senate Select Committee to Study Government Operations with respect to Intelligence Activities. Book II, *The Growth of Domestic Intelligence: 1936 to 1976*. Government Printing Office (1976). It is also available on line at http://www.aarclibrary.org/publib/contents/church/contents_church_reports_book2.htm.

about the terrorist attack in Benghazi. The IRS has systematically harassed the president's political opponents. The president has violated the legislative authority of Congress with regard to Obamacare and immigration law and has subverted the process of congressional confirmation of presidential appointments. When it comes to presidential abuses of power, Obama makes Nixon look like an amateur.

*Obstruction of justice*

The most important article of impeachment that Nixon faced was the one charging him with obstruction of justice. It was the first article to be voted on and was by far the most serious—then and now. What is so interesting in retrospect is that the House Judiciary Committee conducted virtually no investigation of its own, relying instead on the work of the WSPF. Relentlessly focused on removing Nixon from office, those prosecutors took the unprecedented step of secretly conveying to the House Judiciary Committee the results of their investigation—an investigation whose primary factual assertions turned out to be entirely wrong.

Here, I submit, is a tale of prosecutorial and judicial corruption that has never before been disclosed to the American public.

**What Did the Prosecutors Know and When Did They Know It?**

The Watergate Special Prosecution Force was established principally to investigate and prosecute the crimes of Watergate. This mandate meant starting at the bottom with the known crimes and then, in typical prosecutorial fashion, working their way up in the Nixon White House. They might get to the president eventually, but no one expected them to start there. But something intervened in this process of nailing President Nixon's aides. Suddenly, the big prosecutorial guns were no longer aimed just at them. As nearly as can be determined, this dramatic change of prosecutorial focus occurred in December 1973, just after the release of the first set of White House tapes.

Alexander Butterfield, a deputy assistant to the president, revealed the existence of the White House taping system in testimony before the Senate Watergate Committee on July 16, 1973. A week later, relying on Dean's testimony, prosecutors obtained a grand jury subpoena for recordings of eight (later clarified to be nine) presidential conversations. Judge Sirica upheld the grand jury subpoena at the end of August, announcing that he would first review the recordings for relevance to the grand jury's criminal investigations. The court of appeals, sitting en banc, upheld the subpoena on October 12 and ordered the tapes turned over for Sirica's review.

The White House offered a compromise in which it would turn over transcripts, rather than the tapes themselves, which Senator John Stennis, a conservative Democrat from Mississippi, would authenticate by listening to the actual tapes. When Archibald Cox refused the compromise, Nixon had him removed as Watergate Special Prosecutor in the "Saturday Night Massacre" of October 19, 1973.

In the days that followed, the White House agreed to turn over the subpoenaed tapes themselves but soon informed the court that two of the conversations at issue had not been recorded and that the tape of June 20, 1972, contained an unexplained eighteen-and-a-half-minute gap. In late November and early December 1973, Sirica reviewed the seven surrendered tapes himself and arranged for copies to be turned over to WSPF prosecutors. On December 12, according to Richard Ben-Veniste, the prosecutors first listened to the tape of March 21, 1973—Dean's "cancer on the presidency" meeting with Nixon—in which the president was informed of Howard Hunt's blackmail demands. The prosecutors' reaction was immediate and unambiguous: this was evidence that President Nixon had committed a series of criminal offenses.

In his Watergate memoir, Leon Jaworski, who had taken over as special prosecutor on November 5, described his own reaction to hearing that tape:

I was badly shaken, so shaken that I didn't want anyone to notice it. I left Carl Feldbaum's office that mid-December morning and made my way back to my own. I closed the door behind me. I needed to be alone.

My brain was acting like a ticker-tape. My thoughts were clear, but they ran through my mind without break, one becoming another and then quickly another. But one thought kept coming back, hammering its way through the others: The President of the United States had without doubt engaged in highly improper practices, in what appeared to be criminal practices. I had heard the evidence. I had listened to that voice … as the President plotted with his aides to defeat the ends of justice.[3]

The White House would argue four months later, when they made this recording available to the House Judiciary Committee and released transcripts to the public, that while the president did toy with the idea of meeting Hunt's blackmail demands, it was only for the purpose of buying time so that the White House could get its story out ahead of his. The president's aim was, in essence, to defeat Hunt's ability to blackmail them by disclosing that information themselves. In any event, the White House would assert, no decision was made during that meeting with Dean to take any such action. Instead, the president had announced to his aides that same day that he had decided to require his staff to appear before the Ervin Committee without claim of executive privilege in exchange for closed, non-public hearings. Besides, the White House argued, the question of Hunt's blackmail demand became moot the following day, when Mitchell indicated that he thought that the matter already had been addressed.

But to Jaworski and his staff the March 21st tape was damning, in and of itself, simply because the payment of blackmail was given serious consideration. Of course, this tape was at the time the only evidence of any presidential involvement that they had, so it should come as no surprise that they chose to view it in its worst possible light.

The second development that re-focused the WSPF prosecutors' sights on the president occurred on or about December 27, when they concluded that they had circumstantial evidence that President Nixon himself had ordered that Hunt's blackmail demands be met.

---

[3] Leon Jaworski, *The Right and the Power: The Prosecutions of Watergate* (New York: Reader's Digest Press, 1977), p. 45.

This was the date when they were first able to pinpoint the time at which the last "hush money" payment was made to Hunt's attorney, William Bittman. It was already known that this payment had occurred sometime during the week ending on Friday, March 23, when Hunt was scheduled to be sentenced and taken into custody. While none of the government's witnesses—including Fred LaRue, who had made the payment, and Bittman, who had received it—had kept detailed records, they all seemed to think that this last delivery had occurred on the evening of Tuesday, March 20.

When WSPF prosecutors determined that the delivery had actually occurred on Wednesday evening, March 21, however, everything changed—at least from their perspective. Wednesday was the very day that Dean had first informed Nixon of Hunt's blackmail demand. If the money had been delivered that very evening, it might be possible to show that President Nixon himself had authorized and directed that final payment.

This possibility, which I call the "Frampton Supposition" (after George Frampton, who authored the memorandum that laid this all out)[4], allowed the prosecutors to think they could show Nixon's active involvement in the payoff scheme—an unambiguous and overt obstruction of justice. You can see why they found this idea so enticing.

The following facts, which supported the Frampton Supposition, were already established:

- Dean had learned of Hunt's monetary demands—seventy-five thousand dollars for legal fees and sixty thousand dollars for future financial needs—from CRP attorney Paul O'Brien on Monday morning, March 19.

---

[4] Frampton may not have been the ideal choice for someone to author such important documents, since he lacked any prosecutorial experience. According to the dust jacket of his 1977 book with Richard Ben-Veniste, "He was working as a public interest lawyer in June 1973 when his former professor Archibald Cox asked him to join the Watergate prosecution team a few days after it was set up."

- Dean had informed LaRue of Hunt's demands on either Tuesday evening or Wednesday morning and had suggested he might seek John Mitchell's approval before making payment.

- LaRue had spoken to Mitchell by phone and obtained approval for payment of the legal fees. The timing of this call, however, would be crucial to the prosecutors' theory.

- Dean's March 21st meeting with Nixon ran from about 10:00 am until noon. Haldeman joined them for the last half hour.

- Shortly after that meeting concluded, Haldeman called Mitchell. There was no recording of their conversation, and the White House maintained that the sole purpose was to invite Mitchell to a meeting the following day, but it was uncontroverted that such a call had occurred.

- Haldeman, Ehrlichman, Dean, and the president met at 5:00 pm that Wednesday afternoon to continue their discussions of how to respond to Hunt and how to handle the next day's meeting with Mitchell.

- At 10:00 pm that same Wednesday evening, LaRue made a seventy-five-thousand-dollar payment to William Bittman, Hunt's attorney.

All that was necessary for the Frampton Supposition to work was for the phone call between LaRue and Mitchell to have occurred *after* Haldeman's call to Mitchell. If that were the case, the prosecution could argue that, after Dean had departed from his morning meeting with the president, Nixon (who in the tape had clearly displayed an inclination to meet Hunt's demands) must have directed Haldeman to contact Mitchell and tell him to instruct LaRue to make the payment to Bittman, as LaRue had done that very evening.

It mattered little that Haldeman and Mitchell (and even Nixon, if it ever came to that) would stoutly deny that this was Nixon's instruction or that the purpose of Haldeman's phone call to Mitchell was to arrange the payment to Hunt. After all, they were soon going to be indicted, and the House Judiciary Committee and the cover-up trial jury could be expected to disregard their denials.

**What Did the Prosecutors Do and When Did They Do It?**

The beginning of the WSPF's focus on this beguiling possibility is best illustrated by two internal memoranda. The first is the 128-page draft Prosecutive Report on President Nixon prepared by George Frampton of the Watergate Task Force and dated January 7, 1974. It details, in the midst of a much longer analysis of possible presidential culpability, the facts summarized above. That section of the report was probably inserted into a draft already under preparation. The second illustrative memo is from Philip Lacovara to Jaworski, bearing the same date[5] and accompanying a more detailed analysis by a staff member, explaining how a defendant joining an ongoing conspiracy (which they were now certain that Nixon had done on March 21) could be held equally culpable for that conspiracy. It concluded:

> Thus, D [for Defendant] could expect that failure of the conspiracy to continue successfully would jeopardize his ability to continue in office and to discharge his obligations effectively. The course of action he advised and which was, in fact, followed was plainly intended to ensure that the conspiracy did not fall apart. Accordingly, it is only fair to conclude that D knowingly, deliberately, and for his own benefit adopted and promoted the unlawful venture, thereby making it his own.[6]

As we will see, WSPF efforts to prove President Nixon's involvement in the last Hunt payoff quickly merged with their work on the comprehensive cover-up indictment. I will address this convergence in the remainder of this chapter but break it into several separate topics for ease of explaining the significance of each: the internal battles within the WSPF, their secret

---

[5] This memo, "Criminal Responsibility for Joining Ongoing Conspiracy" is reproduced in full at Appendix H.
[6] Memo of January 3, 1974, from Peter Rient to Philip Lacovara, "Hypothetical Conspiracy Case," p. 3 (included as a part of Appendix H).

consultations with Sirica, the decision to transmit a sealed grand jury report to the House Judiciary Committee, and the secret naming of President Nixon as an unindicted co-conspirator in the cover-up indictment.

*WSPF's internal battles: Jaworski vs. Cox's Army*

When Jaworski was appointed special prosecutor on November 5, 1973, his first challenge was to gain the confidence of the staff he had been appointed to lead. He never gained actual control, of course, because their investigatory work was well under way when he arrived. All he could hope to achieve was an uneasy truce in the tug of war over how to handle their intended prosecutions.

It seems clear that the Frampton Supposition occasioned any number of battles within the WSPF, primarily because the staff prosecutors were unsure how best to exploit evidence of their newfound belief in Nixon's personal involvement. Jaworski decided to consult secretly with Sirica— at least that is the logical conclusion from a fascinating section of the book by James S. Doyle, WSPF's communications director. After several pages describing the WSPF lawyers' certainty that Nixon had become an active participant in the cover-up conspiracy and the obligation they felt to so inform the House of Representatives, Doyle writes:

> Toward the end of January a consensus began to emerge from the non-stop discussions and arguments. From the beginning one option had been clear. The grand jury could make a presentment to the judge which would lay out the case against Nixon and note that the grand jury was not issuing a formal indictment only because he was a sitting President. It seemed to carry with it all of the problems and disadvantages of an indictment and none of the legal virtues.[7]

Not happy with this approach, Doyle then describes how Jaworski had been discussing their options and various approaches with Sirica:

---

[7] James S. Doyle, *Not Above the Law* (New York: Morrow, 1977), p. 284 [9] Ibid. p. 285

Jaworski met with Judge Sirica privately during this period, and while he never disclosed any discussions he might have had with the judge on this subject, his final, irrefutable argument against an indictment or other accusation against Nixon was, "Judge Sirica will not allow this. He will condemn the grand jury for overreaching, and he will condemn us for condoning or inspiring it. And he will dismiss the action out of hand."[9]

The objections that Jaworski here attributes to Sirica are materially different from the judge's concerns about a grand jury report that were detailed in Jaworski's February 12th memo discussed earlier. It seems clear that Sirica's two sets of concerns were conveyed to Jaworski in different discussions with the judge.

It is possible that Doyle, who is not a lawyer, did not appreciate the significance of his casual disclosure of the meetings between Jaworski and Sirica. In any case, his is the only book that mentions such a series of consultations between these two supposedly independent figures.

These same internal WSPF discussions also triggered a most interesting exchange of memos between Jaworski and Henry Ruth, the deputy special prosecutor. Originally hired by Cox, Ruth was now having second thoughts about the staff's initial conclusions concerning how to handle President Nixon. These memos are also a part of the materials that have only recently come to light as a result of the author's FOIA requests.

Ruth wrote to Jaworski on January 2, 1974, to reiterate his view that, even if criminal charges might be brought against the president, he and Cox had concluded that the proper avenue was the impeachment process, not indictment or naming the president as an unindicted co-conspirator. Ruth urged, however, that WSPF prosecutors immediately share with the House Judiciary Committee all of the evidence and findings of their grand jury with regard to the president. He believed that the committee staff were in substantial need of the WSPF's assistance and, without the WSPF's help, would fail in their high purpose of building a strong case against the president.

If that cooperation did not achieve the desired result (i.e., Nixon's impeachment), Ruth continued, then WSPF prosecutors should reconsider the idea of naming Nixon in a subsequent indictment.

In his response, dated January 8, Jaworski agreed that the proper path regarding Nixon was that of impeachment and not indictment (even if the facts were supportive) but disagreed that it was their responsibility to come to the immediate aid of the Judiciary Committee.

> Archibald Cox, as well as you, has wisely concluded, it tentatively occurs to me, that the President should not be indicted nor should he be named as a co-conspirator, assuming that the proof warrants either of these courses. As to the naming of the President as a coconspirator Cox was quoted as opposing it because it was "just a back-handed way of sticking the knife in." If these are sound conclusions they remain sound whether the impeachment process falters or flourishes. In my present view, I can find no justification for violating our other responsibilities [to bring charges against Nixon's aides] … simply because we find it unsupportable to indict the President or to name him as co-conspirator.

> Let me add these further thoughts. There are numerous situations that justify naming as an unindicted co-conspirator, but the President does not belong in this category. The very fact that such an act would brand him indelibly without an opportunity to defend himself, rules out such a procedure, in my estimation.

One cannot help but be struck by how firmly Jaworski rejected Ruth's suggestions about assisting the House Judiciary Committee and naming the president in their cover-up indictment. Replying on January 14, Ruth pointed out that he had argued that it might become crucial to name the president in the indictment *only* if the House's impeachment process were to founder, perhaps as a result of some lack of cooperation from the White House and the special prosecutor.
Besides, he emphasized, Cox had "always believed that cooperation with the impeachment process was proper."

On January 21, Jaworski drafted a response to Ruth, properly characterizing the situation in which he found himself:

I said before and emphasize again that the mere conclusion that the President is not indictable or should not be named as an unindicted co-conspirator furnishes no basis for our pursuing still another course beset with restraints that should not be violated. I mean this: If it is not sound in law or policy to indict the President; if it is not sound in law or policy to name him as an unindicted co-conspirator—it cannot become so simply because the efforts of the House to impeach are frustrated. Differently stated, if the House bogs down in impeachment because of lack of evidence that cannot be properly and legally released to it or because of its own failures, the unindictable President does not, perforce these shortcomings, become indictable.

Although our mandate authorizes us to proceed against the President, it nowhere suggests that we are to do so regardless of fairness or just procedure. More specifically it does not authorize us to violate grand jury procedures, something I observed your memorandum avoids dealing with.[8]

This direct and candid clarification from the special prosecutor to his deputy—firmly insisting that the president would not be indicted or named an unindicted co-conspirator and that grand jury information would not be shared with the House—is all the more instructive since he felt that he had to put it in into writing. One cannot help but wonder what caused Jaworski to change such a firmly stated position.

In later paragraphs of that same response, Jaworski's description of the WSPF office undermines any claim that they were simply professional prosecutors going about their business without prejudice or political agenda:

Now let me address myself to the general tenor of your memorandum which reflects an attitude I discussed with you before—the subjective conviction that *the President must be reached at all cost* [emphasis added].

What is of some concern to me are the discussions, plans and understandings had and reached between staff members prior to any discussions with me. This results in convictions already formed and frankly, under such circumstances, the meetings are of no help to me.

Perhaps I should not consider it such a lonely task, but inasmuch as I have the final responsibility, henceforward the discussions I seek will be with those I designate. The stubborn fact remains that we must be alert not to give support to the White House charges that have been leveled against the staff. Perhaps it is too late to get objective

---

[8] This memo is reproduced in full at Appendix I.

opinions from others so I will do the best I can in the making of decisions for which I— and not the staff—will be held responsible. It is a simple thing for you and others to discuss views and convictions you formed along the way because you do not have the ultimate responsibility.

These are exceptionally strong words of concern—WSPF prosecutors have lost all objectivity, they are out to get President Nixon "at all cost," and are ironing out internal dissent prior to any meetings with Jaworski. There can be little doubt that the stampede that the special prosecutor denounces was occasioned by the enticing opportunities presented by the Frampton Supposition.

Curiously enough, Richard Ben-Veniste, the head of the Watergate Task Force, recalled Jaworski's attitude at that time quite differently in the Watergate memoir he wrote with George Frampton:

> From what little the Special Prosecutor said to us in December and early January about President Nixon it appeared to the task force that his central concern was to see President Nixon removed from office. In the first place, Jaworski had obviously concluded on the basis of the evidence that such a person should not in the national interest continue to lead the country. Moreover, Jaworski calculated that the President probably would not be able to cling to his office for long after the tapes were made public. In Jaworski's mind, seeing Richard Nixon out of the White House was the most important achievement he could render the country as Special Prosecutor.[9]

The WSPF eventually pursued a course at odds with the more cautious approach Jaworski was insisting on in his January memoranda. The indictments in the cover-up case were handed down on March 1, 1974, but were kept sealed from the public at the recommendation of the prosecutors and upon the order of the judge to allow them (one suspects) to control the timing and context of their dramatic disclosure. The grand jury, at Jaworski's urging, named the president as an unindicted co-conspirator, and WSPF prosecutors worked closely with Judiciary Committee staff, in secret, to share grand jury information and their own prosecutorial theories to assist in the committee's investigations of President Nixon and in the

---

[9] Richard Ben-Veniste and George Frampton, *Stonewall: The Real Story of the Watergate Prosecution* (New York: Simon & Schuster, 1977), p. 222.

writing of its impeachment report. It remains unclear how Sirica's and Jaworski's opposition to one or both of these approaches was overcome, but the "get Nixon at all cost" culture of Cox's zealous army seems to have prevailed.

*WSPF ex parte meetings with Judge Sirica*

We have already discussed details that have come to light regarding the series of private meetings that WSPF prosecutors held with Sirica, at least those that we now know of. It appears they discussed the meaning and importance of the March 21st tape in their meeting with Judges Sirica and Gesell on December 14, 1973. Lacovara's January 21st memorandum urged another such meeting to persuade Sirica with regard to the proposed grand jury report to the House, the discussion of which occurred when Jaworski met privately with Sirica on February 11. Doyle seems to describe other discussions between Jaworski and Sirica concerning Nixon's being named in the indictment.

*Drafting the grand jury's Road Map*

One of the real public surprises at the March 1st hearing in Judge Sirica's courtroom when the Watergate grand jury's cover-up indictments were handed down was the dramatic presentation of a brown, government-issue satchel containing a sealed envelope addressed to Sirica requesting that he transmit its contents to the House of Representatives. That report, known as the "Road Map" and ultimately transmitted as requested, has remained sealed to this day.

The Watergate Task Force was growing impatient with the House Judiciary Committee's investigations and felt compelled to push them along. Ben-Veniste and Frampton write:

> John Doar, the House Judiciary Committee's chief counsel, had launched an exhaustive staff effort to gather and cross-index every fact, however insignificant, that related to the committee's inquiry. In an ideal world and with infinite time this endeavor could have proved useful. Under the circumstances, however, it precluded immediate action to what was most urgently needed: an attempt to summarize the most

*important* evidence against the President in a meaningful way, so that it could be readily understood and assessed by Congress and the public.

The Judiciary Committee's plight convinced some of us that members of Congress from both sides of the aisle were going to have to have the significance of the evidence spelled out for them in neon letters before they would act. The Watergate Task Force believed that the grand jury should be told it could make a report to the Judiciary Committee that not only transmitted evidence but summarized and commented upon it. The summary, we thought, could articulate the "theory of the case" against the President. It could show how the tapes and other evidence fit together and demonstrate that the President had been trying to hold the cover-up together in March and April of 1973.[10]

This is an excellent example of the arrogance displayed by members of the Watergate Task Force. They were supremely confident that they and they alone were in the best position to arbitrate what the House Judiciary Committee should know and act upon. It also turns out, not insignificantly, that the members of the Watergate Task Force had absolutely no idea of the internal battles and considerations going on between Jaworski and Ruth at the staff level of the special prosecutor's office.

Nor did the task force prosecutors know in 1974, or even when Ben-Veniste's and Frampton's book was published in 1977, that Doar, according to the chief counsel of the House Judiciary Committee, Jerry Zeifman, was intentionally slowing down the committee's impeachment inquiry by occupying the vast majority its staff with busy work in order to allow public pressure to continue to build against President Nixon and the Republican Party.[11] The prosecutors must have been disappointed in the extreme when the committee did not act immediately on their Road Map or leak any of its contents to the press.

It is not clear whether and to what extent anyone other than WSPF prosecutors and Sirica knew that the satchel also contained copies of White House tape recordings. Indeed, it appears

---

[10] Ibid. pp. 241–242, emphasis in original.
[11] See Jerry Zeifman, *Without Honor: The Impeachment of Richard Nixon and the Crimes of Camelot* (New York: Thunder's Mouth Press, 1995).

that everyone had been assured that this would not happen, as Ben-Veniste and Frampton write:

> Jaworski had already tried to calm White House fears that we were going to ship our Presidential documents and tapes to the Congress wholesale. In early January the Special Prosecutor gave an interview in which he stated that Presidential material gathered in the
> Watergate investigation would *not* be turned over by the prosecutor's staff to the House Judiciary Committee. This would violate legal rules of grand-jury secrecy, Jaworski was quoted as saying, and would be contrary to the Court of Appeals tapes decision by which we obtained the tapes explicitly for grand jury use.[12]

In addition, Jaworski's recollection of his phone call with Haig the evening before the indictments were announced suggests another misunderstanding, whether deliberately intended or not:

> On the evening of February 28, just as I was preparing to leave my office, General Haig called. Rumors were afloat, he said, about a possible indictment and a sealed report. "Is there anything you can properly disclose to me, Leon?" he asked.
>
> "Nothing about the indictment or the report," I said. "If the grand jury does make a report, you should expect Judge Sirica to accept it and act on it."
>
> "Let me ask you this," he said. "Is there any indictment involving present White House aides? I'd need to make arrangements to meet the situation."
>
> "Don't worry about those arrangements," I said.
>
> He seemed relieved. "You're a great American, Leon."[13]

Haig's own memoir is silent about this phone call, but it is likely that he took Jaworski's disclaimer as all-inclusive—indicating that no action was forthcoming with regard to President Nixon. And indeed, none seemed to be, since Nixon's being named as an unindicted coconspirator was kept secret when the indictment was announced.

---

[12] Ben-Veniste and Frampton, p. 217, emphasis in original.
[13] Jaworski, p. 103.

Fooled into believing that Nixon was not implicated in the grand jury actions and that the grand jury report was little more than a rationale for the indictment of the seven Watergate cover-up defendants, the White House took the position that it did not object to its transmittal or even to its public disclosure.

But two of the cover-up defendants, Haldeman and Ehrlichman, did object to the proposed transmittal of the Road Map to the House. They pointed out that never in the history of the D.C. Circuit had a regular grand jury issued such a report—let alone while its investigation was still ongoing. They also asserted that the resulting publicity when this material was inevitably leaked would prejudice their defense.

Amazingly, Sirica had the audacity at his March 6th hearing on this matter to raise the possibility that the Judiciary Committee ought to postpone its impeachment investigation until the conclusion of the cover-up trial over which he would soon preside. "What harm would be done by waiting for this trial, which will begin September 9th?" he asked. Somehow none of the lawyers present, particularly those representing the Judiciary Committee and the president, felt that halting the committee's own investigation during the pendency of Sirica's show trial was prudent or even feasible.

On March 18, Sirica ruled in favor of transmitting the Road Map. His opinion did not mention the inclusion of any tapes, but it did indicate that he knew what would be transmitted: "After having had an opportunity to familiarize itself with the contents of the Report, the Court invited all counsel who might conceivably have an interest in the matter, without regard to standing, to state their positions concerning its disposition."

Haldeman and Ehrlichman appealed to the D.C. Circuit two days later, and the appellate hearing was held and decided the very next day—a harbinger of the quick affirmations of Sirica's rulings that were to dog them throughout their defense. Sitting en banc, the five

members of the circuit court's liberal block issued an unsigned order upholding Sirica's ruling.[14]

In its brief order, the court relied heavily on the judgment of the special prosecutor in instituting the report and on that of Sirica in upholding its transmittal, saying that their determination that the defendants could still receive a fair trial was more persuasive than the "slender reed" raised regarding possible prejudicial pre-trial publicity. Nowhere in the court's opinion, including in Judge MacKinnon's dissent, was it acknowledged that some of the "selected evidence" being transmitted included actual tape recordings and WSPF transcripts.

The White House had consistently resisted court enforcement of congressional subpoenas of tape recordings and had prevailed in suits before Sirica, Gesell, and the D.C. Circuit. It seems clear in retrospect that if the White House had known of the inclusion of tape recordings, they would have objected to their transmittal in this manner because of the precedent that would be set. It further appears that had the court of appeals been formally informed of the tapes' inclusion, it too would have been hard pressed to uphold the transmittal's propriety. Both the WSPF prosecutors and Sirica must have realized this, which is why they took great pains to avoid any specific mention of the inclusion of the tapes themselves.

So, what did the much heralded Road Map say? While it remains sealed, the best source as to its contents is James Doyle, who wrote:

> It was a simple document, fifty five pages long, with only a sentence or two on each of the pages. Each page was a reference to a piece of evidence—sentences from one of the tape recordings, quotations from grand jury testimony.
>
> Someday the archives will be opened and what the prosecutors referred to as "the road map" will be made public. What that happens it will prove a simple and unimpressive document, for it is narrow, declaratory, without conclusions.
>
> This is how the road map worked: One page might say, "On March 16, 1973, E. Howard Hunt demanded $120,000." Then it would list page references to grand jury

---

[14] *Haldeman v Sirica*, 501 F2d 714 (D.C. Cir. 1974).

testimony from witnesses who saw Hunt's blackmail note and references to tapes where Hunt's demand was discussed. The grand jury transcripts and the tape transcripts would be included. The next page might say, "On March 21, 1973, John Dean told President Nixon what Hunt had demanded $120,000, and that he estimated Hunt and the other Watergate defendants would 'cost' a million dollars in the next two years." More grand jury and tape transcript page references. The next page would say, "President Nixon responded, 'For Christ's sake, get it'"; and there would be further references to the tapes.

The strength of the document was its simplicity. An inexorable logic marched through its pages. The conclusion that the President of the United States took part in a criminal conspiracy became inescapable.[15]

Doyle's example of "how the road map worked" suggests that it made the same unsupported leap that Frampton made in his draft prosecutorial report, namely, that since the March 21st payment to Hunt's lawyer followed Dean's meeting with President Nixon, the payment must have been made as a result of that meeting.

The Frampton Supposition is a classic example of the logical fallacy *post hoc, ergo propter hoc*—literally, "after this, therefore because of this." The Watergate Task Force built its case on this fallacy because it had to—it had nothing else. Charging ahead, the prosecutors privately informed the grand jury and the House Judiciary Committee of their conclusion that President Nixon had personally ordered actions in furtherance of a criminal conspiracy, hoping that everyone would fail to notice or ignore the missing causal link.

*Naming Nixon as an unindicted co-conspirator*

In addition to transmitting a report to the congressmen contemplating the impeachment of the president, the grand jury followed the WSPF prosecutors' counsel and named Nixon as an unindicted co-conspirator in the Watergate cover-up.

---

[15] Doyle, pp. 290–291.

As a part of their comprehensive cover-up indictment, the grand jurors had voted nineteen to zero on February 25, 1974, to take this unprecedented action following a personal appeal by Special Prosecutor Leon Jaworski. When the grand jury had taken an earlier straw poll on whether to indict the president, Ben-Veniste had been in the room, at least according to the grand juror George Gross.[16] Grand jury votes are not supposed to be taken in the presence of prosecutors, and aside from whether straw votes should be taken at all, the episode indicates how closely involved with the jurors the WSPF prosecutors had become.

Naming President Nixon as a co-conspirator was the very action that Archibald Cox had publicly announced he wouldn't allow, but Cox was long gone. Jaworski's own initial, adamant refusal also had been overcome—no doubt as a result of the confidence that the Frampton Supposition had inspired in the prosecution.

Naming the president as an unindicted co-conspirator was deceptively simple and diabolically clever. It put him into an impossible position, both legally and politically—accused of criminal conduct by the grand jury, but unable to come into a court of law to defend himself. But there was an added benefit: the simple expedient of naming Nixon as a co-conspirator made all the White House tape recordings admissible at trial through an exception to the hearsay rule that will be discussed in the following chapter. One wonders whether the advantage in trial tactics was the real reason in overcoming the lead prosecutors' prior objections to including the president among the conspirators.

### Help for the House Judiciary Committee

Apparently, the Road Map was not clear enough for the House Judiciary Committee, and WSPF prosecutors felt obliged to hold secret meetings with its staff to assure that they appreciated what the prosecutors believed they had uncovered. These secret contacts with the impeachment staff began in May, Ben-Veniste and Frampton write, going out of their way to

---

[16] A Brian Lapping Associates Production for The Discovery Channel and the BBC (1994), Vol. Three: *The Fall of a President*.

insist that they and his colleagues were "sensitive" to the rules of the rules of grand jury secrecy.[17]

To provide a sharper focus for these meetings, Henry Ruth suggested that Frampton's 128-page Prosecutive Report on President Nixon should be revised so that prosecutors would have "in hand a comprehensive, up-to-date prosecutive memorandum laying out all of the evidence against the President."[18] Frampton's sixty-four-page revision, dated June 28, 1974,[19] reflects a single-minded focus on the events of March 21, as is evident from its opening paragraph:

> This memorandum focuses on facts, inferences, and theories that demonstrate that beginning no later than March 21, 1973, the President joined an ongoing criminal conspiracy to obstruct justice, obstruct a criminal investigation, and commit perjury….

This contention is directly contrary to President Nixon's essential Watergate defense (which Dean vigorously supports in his recent book)—that Nixon didn't fully appreciate what had been going on before his March 21st meeting with Dean, after which he began trying to get to the bottom of it. In contrast, WSPF prosecutors asserted that Nixon had joined the cover-up conspiracy upon learning of it.

Frampton recounts the prosecution's version of the events of March 21—on the president's instructions, Haldeman called Mitchell after the meeting with Dean and told him to instruct LaRue to meet Hunt's blackmail demand, which LaRue did that evening—and then sets forth the prosecution's theory of Nixon's criminal liability:

> The actions and statements of the President set out above are sufficient to show that the President joined and became an active participant in a conspiracy to make cash

---

[17] Ben-Veniste and Frampton, pp. 285–287.
[18] Ben-Veniste and Frampton, p. 286.
[19] The Frampton revision is too long to reproduce in full, but is available upon request from the Special Access section of the National Archives.

payments to Howard Hunt and others in order to influence their testimony before various tribunals.

The President's counsel has argued that the President did not specifically instruct anyone on March 21 to make the payment to Hunt and that in any event the $75,000 paid on that same night was not paid on a direct chain of instructions emanating from the President. Despite this argument, there is certainly sufficient evidence—consisting of the undisputed facts listed above together with a single inference that a reasonable man could certainly draw therefrom in light of all the surrounding circumstances—to permit a jury to conclude beyond a reasonable doubt that the President did instruct that Hunt be paid and that the President's instructions were communicated by a direct chain of communication from Haldeman to Mitchell to LaRue, thereby becoming the causal force of the payment that evening. [pp. 16–17]

Frampton goes on to say that, even if they couldn't prove a direct casual connection, a jury could still find beyond a reasonable doubt that the President "threw his lot in with the conspirators and had made their purpose his own," and that, even if there had been no seventy-five-thousanddollar payment at all, "there probably would be sufficient evidence upon which the jury could find Presidential liability," While his intent was to cover all of the bases, the main thrust of Frampton's report was WSPF prosecutors' belief in the Frampton Supposition, which he repeated:

Given the entire chain of circumstances, given the President's urgent concern about Hunt's threat on the morning of March 21, and given Haldeman's role as the President's chief of staff ordinarily charged with communicating the President's desires directly to those who were required to take highly significant action, a jury could certainly draw the inference that Haldeman did pass along the President's feelings as instructions to Mitchell. Such an inference completes the casual chain. [p. 27]

This revised memorandum indicates in the clearest terms the WSPF prosecutors' nearly exclusive reliance on the Frampton Supposition as the primary evidence of the president's personal guilt and their eagerness to convince the House Judiciary staff of their conclusions.

But if we pause to reexamine the Frampton Supposition in the cold light of day, we can see it for what it was. It was not, in fact, "a single inference that a reasonable man could certainly draw … in light of all the surrounding circumstances" but an argument with absurd implications. By making this one reasonable leap of faith, Frampton maintains, a jury could conclude beyond a reasonable doubt that Nixon did what no actual evidence shows he did. As we shall see, the reasonableness of that single inference did not hold up when challenged in court, and their theory was quietly abandoned, but only after the damage had been done.

Armed with Frampton's revised Prosecutive Report, WSPF staff connived to convey its full import to John Doar, lead counsel to the Judiciary Committee's impeachment inquiry. Ben Veniste and Frampton describe how they pulled this off:

> Within a few days John Doar became aware of the existence of this memorandum. Doar demanded the document and told the Special Prosecutor and his deputy that he would recommend to the full Judiciary Committee that it be subpoenaed if necessary. Doar was told, in response, that we believed it would be unwise to have a copy of this document go to the committee physically, as it was an internal prosecution document. Since it was obviously relevant to the impeachment inquiry, however, Doar would be permitted to examine it in our offices if he agreed to withdraw the "threat" of a subpoena. Several late evenings that week Doar pored over the memorandum in Ruth's office, taking copious notes.[20]

What Ben-Veniste and Frampton omit is that Doar's supposed demand for the report and the WSPF's response are documented by three letters, all dated the same day and all helpfully bearing the notation "By Hand," as though this exchange of letters really had occurred over the course of a single day. The unlikelihood of such an exchange raises a suspicion that these documents were created after the fact to give the appearance of propriety to the prosecutors' sharing their report with Doar.

Ben-Veniste and Frampton also neglect to point out that, by supposedly following this procedure (and avoiding the formality of a subpoena), WSPF information was conveyed to the

---

[20] Ben-Veniste and Frampton, p. 287.

impeachment inquiry staff in secret. The president's lawyers, unaware of these meetings, had no opportunity to challenge them or to refute the memorandum's assertions. Since the WSPF's assistance to the House impeachment inquiry was kept secret, it could not be reviewed by a court of law.

Frampton's revised report certainly did the trick. The WSPF prosecutors' certainty of Nixon's guilt easily carried the day. On July 27, the Judiciary Committee voted twenty-seven to eleven to adopt the first article of impeachment, for obstruction of justice, which provided in pertinent part:

The means used to implement this course of conduct or plan included one or more of the following:

(5) approving, condoning, and acquiescing in, the surreptitious payment of substantial sums of money for the purpose of obtaining the silence or influencing the testimony of witnesses, potential witnesses or individuals who participated in such unlawful entry and other illegal activities.

In essence, the Frampton Supposition provided the substantive underpinning for WSPF prosecutors' assurances – to the grand jury and to the House Judiciary Committee -- that Nixon was personally involved in authorizing the final Hunt payoff. When it came time to prove their thesis in an actual court of law, subject to rules of evidence and the opportunity to confront and cross-examine witnesses, WSPF prosecutors failed miserably and the Frampton Supposition was quietly abandoned. But it was not for lack of trying.

**The Cover-Up Trial: Convicting Nixon in Absentia**

President Nixon may have been pardoned and thus out of reach of WSPF prosecutors, but the cover-up trial gave them the opportunity to prove their prosecutorial theory. Nixon was not an actual defendant at this trial, but he was certainly being tried in absentia as a principle target of WSPF prosecutors.

Proving the Frampton Supposition was one of the prosecution's paramount goals at this trial. Nixon, they argued, would have revisited Hunt's blackmail demands with Haldeman right after Dean left their meeting at 11:55 a.m. on March 21, 1973. The president would have told Haldeman to contact Mitchell in New York to order that Hunt's demands be met. For this scenario to work, Fred LaRue would have to have talked with Mitchell in the *afternoon* of March 21 (that is, subsequent to Haldeman's phone call, which clearly followed Dean's meeting with Nixon).[21]

To perfect their scenario, the WSPF had to corral its witnesses into telling a consistent story about a matter that had not been so critical when they testified before the Ervin Committee and subsequent grand juries. Ideally, Dean and LaRue would testify that their conversation occurred on March 21, and not before, precluding any alternative interpretations.

But Dean's recollection up to this point, reflected in WSPF documents, had been that his conversation with LaRue had occurred on March 20. The July 1974 draft of Dean's anticipated testimony noted with asterisks (*) any significant discrepancies with Dean's prior testimony or that of other government witnesses:

> On March 20 or 21, Dean had a conversation with LaRue in which LaRue asked Dean what should be done about Hunt's demand and Dean said that Dean wanted nothing more to do with money and would not tell LaRue what to do. LaRue replied that LaRue would not pay any money to Hunt without instructions or authorization from someone else; Dean suggested that LaRue contact Mitchell if he wanted authorization.*

> *Dean believes this conversation was on March 20. If LaRue got authorization from Mitchell on March 21, however, it appears more likely that Dean and LaRue spoke on March 21.

> LaRue recalls this as a telephone conversation. Dean recalls that LaRue came to Dean's office.

---

[21] Haldeman's telephone records did confirm a nine-minute call to Mitchell's offices shortly after the meeting with Nixon and Dean. Both Haldeman and Mitchell testified the only purpose of the call was to invite Mitchell to meet with the president the following day. Of course, WSPF prosecutors insisted upon another interpretation.

> Dean recalls that LaRue was already aware of the threat, presumably through O'Brien. O'Brien denies telling LaRue. LaRue should be questioned about this closely.[22]

Note the challenges to the WSPF desired scenario that are reflected in this document: LaRue remembered this as a telephone conversation of indeterminate date. Dean remembered it as a face-to-face meeting on the evening of March 20. It was troubling—and remains so today—that the government's two witnesses did not even agree on the date or on the format of this critical conversation.

The specific date was finessed in the finalized WSPF memo, which carefully did not predict Dean's actual testimony:

| | |
|---|---|
| 3/20 or early 3/21/73 | Dean and LaRue discuss Hunt demand. Dean says "I am not going to have anything to do with it—take it up with Mitchell." LaRue said o.k. and left. |
| | GJ 11/20/73, 87 GJ 2/14/74, p. 16 |
| | House Jud II 249–250[23] |

---

We have no access to the grand jury testimony that is cited, but we do know that it was John Dean who appeared before the grand jury on November 20, 1973. It is not clear whether the February 14, 1974, appearance was that of Dean or LaRue. Dean's written statement before the Ervin Committee had finessed the matter entirely. He did not allude to any meeting or conversation with LaRue on either March 20 or 21.[24]

---

[22] "Dean's Anticipated Trial Testimony—From the Beginning Up Until March 21, 1974", dated July 22, 1974, by George Frampton, p. 69.
[23] "John Dean, Sequence of Testimony", undated, at p. 44.
[24] Ervin Committee Hearings, pp. 997–999.

In Ben-Veniste's opening statement at trial he also finessed the date of the Dean-LaRue communication, placing it on either March 20 or 21, and whether it was a telephone conversation or in-person meeting:

> Now, either that evening or on the morning of March 21st, before meeting with the President and H. R. Haldeman, Dean informed LaRue of the fact that Hunt was asking for this enormous sum of money.[25]

By the time Dean actually testified at the cover-up trial, however, he must have felt more confident of not being challenged on any inconsistency with his earlier statements to prosecutors, for he was now more open to the possibility that his conversation with LaRue had occurred on March 21. Here is his exchange with James Neal, who was guiding him through his direct testimony:

> Q: Mr. Dean, before we go further on this, I want to ask you to back up to just before you had your conversation with the President about what you just testified and ask you if you had occasion to talk with Mr. Fred LaRue?
>
> A: Yes sir; I did.
>
> Q: About Mr. Hunt's demands?
>
> A: Yes sir; I did.
>
> Q: Tell us when this was?
>
> A: Mr. Neal, that was either on the evening of the 20th there was possibly a telephone call on the evening of the 20th but my best recollection is there was a very brief meeting with Mr. LaRue and myself on the morning of the 21st.
>
> Q: Was that before your meeting with the President?
>
> A: Yes sir.

---

[25] Trial Transcript, p. 2364.

While Dean had now done his part and altered his recollection (in conflict with his earlier testimony), LaRue's testimony about the timing of his conversations with Dean and Mitchell remained problematic. Here is LaRue's exchange with Ben-Veniste, who was guiding him through his direct testimony:

Q: Now, did there come a time on or about the 21st of March, Mr. LaRue, when you learned of additional requests for money from the defendants?

A: Yes.

Q: And what were the circumstances of that?

A: This was a conversation—this was a phone call I had from Mr. Dean.

Q: Can you fix the time?

A: The best of my recollection, the phone call was that morning.

Q: What did Mr. Dean say to you?

A: Mr. Dean said that he had a request for funds for Mr. Hunt. The amount was approximately $130,000, broken down, as I recall, to $60,000 for his living expenses for a year, approximately $75,000 for legal fees.

Q: Sixty and 75 is different than 130.

A: It would be 135. Mr. Dean told me that—or I asked Mr. Dean if he thought I should pay this money. At that time I had that much cash on hand.

Mr. Dean informed me that he was not any longer in the money business, that he was very apprehensive about this operation, he was withdrawing from it and would no longer be involved with anything having to do with money and Watergate affairs.

I told Mr. Dean that I would not undertake to make any payments unless I had some authorization from someone.

Q: Did you call Mr. Mitchell?

A: Yes, I did.

Q: Can you fix the time of day?

A: Again, the best of my recollection, it would be the morning of the 21st.

Q: Do you know whether you actually spoke with Mr. Mitchell on the morning of the 21st?

A: I know I placed the call, whether I talked to him at the time I placed the call or he called me back, I don't know.

Q: Can you say with any certainty whether it was the morning or afternoon that you spoke with Mr. Mitchell?

A: I cannot say with any degree of certainty, no.[26]

This was not the answer that Ben-Veniste wanted. The LaRue-Mitchell conversation had to have occurred *after* the conclusion of Dean's March 21st meeting with the president—which had ended at 11:55 am—for the prosecutors' scenario involving Nixon to be feasible. That is why
LaRue's recollection of a morning call was so devastating—and why Ben-Veniste introduced the idea that maybe the call had not gone through.

Ben-Veniste had pushed LaRue as hard as he dared, even to the point of asking leading questions on direct examination in a desperate attempt to align LaRue's' testimony with the revised testimony of John Dean, but LaRue's responses had hardly been helpful.

While the defendants themselves did not appear to appreciate the critical importance of these exchanges with respect to President Nixon, they did get LaRue to reconfirm his testimony on cross-examination by John Wilson, Haldeman's defense counsel:

Q: Going to the March 21st meeting, you said your best recollection was that you called Mr. Mitchell in the morning?

A: That is correct.

---

[26] Trial Transcript, pp. 6,726–6,728.

Q: Any you testified that you told Mr. Mitchell that they needed $75,000 is that correct?

A: Yes.

Q: Any you fixed the figure of $75,000?

A: That is correct.

Q: And I take it, according to your testimony, that he then asked you what it was for; is that right?

A: That is correct.

Q: And what did you tell him?

A: I told him it was for legal fees.[27]

But it really was much worse. When LaRue was asked why he had asked Mitchell only for authority to pay the seventy-five thousand dollars of legal expenses (instead of Hunt's total demand of $135,000), LaRue responded that they had never paid the full amount requested by any defendant and had always cut it back by some amount. He volunteered that it had been his decision alone to pay only the legal fees portion of Hunt's demands. This unexpected response totally undermined the Frampton Supposition. It is obvious that if the president had ordered the payment based on Dean's representations that morning, the full $135,000 would have been paid.

Dean had changed his testimony to support the WSPF hypothesis and testified that his communication with LaRue—he still maintained that it had been a brief meeting—had occurred on the morning of March 21. LaRue had been brow-beaten into placing the conversation on March 21, but he still maintained that it had taken place over the telephone, and he was clear in his recollection that the conversation had occurred in the morning.

[27] Trial Transcript, p. 6,785.

Without LaRue's testimony that his conversation with Mitchell had not occurred in the afternoon of March 21 (preferably with Mitchell calling him, rather than the reverse, to relay the instructions that Mitchell had allegedly received from Haldeman following the Nixon-Dean meeting of late that morning), and that it was his own idea to cut the payment to seventy-five thousand dollars, the WSPF prosecutors' theory of Nixon's direct involvement in that final payment collapsed. The Frampton Supposition was never advanced again—not in the closing arguments in the cover-up trial and not in the statement of facts or argument in WSPF briefs on subsequent appeals to the D.C. Circuit.

There was no public acknowledgment of the Frampton Supposition's demise, however. It was as though WSPF prosecutors hoped that no one would remember their long-maintained theory of presidential involvement, which they had so forcefully conveyed to the grand jury, had made the basis for the Road Map and for naming Nixon as an unindicted co-conspirator, and had conveyed to the House Judiciary staff as the determining factor in Nixon's impeachment. The Frampton Supposition, which had driven the prosecutors' concerted effort to convince the government's witnesses to change their recollections at the cover-up trial, vanished without a trace—until now.

**Conclusions and Implications**

Much new information has come to light since Nixon's resignation.

We now know that the smoking gun tape has been totally misunderstood, that it did not reveal any criminal interference with the FBI's Watergate investigation, and that it should not have forced the president's resignation.

We also now know that the moving force behind the House Judiciary Committee's first article of impeachment, the WSPF prosecutor's secret and adamant assurance of that they had proof of Nixon's own personal involvement in directing the final payoff to Howard Hunt, turned out to be unsupportable.

America lost a great president when Nixon was forced from office. The damage to our nation, wreaked by prosecutorial excess and judicial malfeasance, is now clear for all to see. Let us now turn our attention to how the same sort of judicial and prosecutorial improprieties denied Nixon's senior aides their constitutional right to a fair trial through systematic violations of the due process of law.